## UNITED STATES *v.* PUGH.

1. The act of March 12, 1863 (12 Stat. 820), relative to abandoned and captured property, as extended by the act of July 2, 1864 (13 id. 375), authorizes the recovery in the Court of Claims of the proceeds of property captured and, without judicial condemnation, sold by the military authorities after July 17, 1862, and before March 12, 1863, if such proceeds were accounted for and credited by the Secretary of the Treasury to the abandoned and captured property fund.

2 Where, in a suit arising under those acts, no direct proof was given that the proceeds of the sale of the property were paid into the treasury, if the circumstantial facts which are established by the evidence are set forth in the finding of the Court of Claims, which it sends here as that upon which alone its judgment was rendered, and they are, in the absence of any thing to the contrary, the legal equivalent of a direct finding that such proceeds were so paid, this court will not on that account reverse the judgment.

3. The judgment of the Court of Claims as to the legal effect of what may, perhaps not improperly, be termed the ultimate circumstantial facts of the case, is, if the question is properly presented, subject on appeal to be here reviewed ; and where the rights of the parties depend upon such circumstantial facts alone, and there is doubt as to the legal effect of them, it is the duty of that court to frame its findings so that the question as to such effect shall be presented by the record.

4. *United States* v. *Crusell* (14 Wall. 1), *Same* v. *Ross* (92 U. S. 281), and *Intermingled Cotton Cases* (id. 651), so far as they bear upon the rule requiring, on an appeal from the Court of Claims, a finding by that court of the facts in the case established by the evidence in the nature of a special verdict, but not the evidence establishing them, cited and explained.

APPEAL from the Court of Claims.

This was an action, brought by Walter Pugh against the United States, to recover the proceeds of certain property. The Court of Claims found the following facts : —

1. In December, 1862, the claimant was in possession as owner of a plantation in Louisiana. The sugar and molasses described in the petition were a part of the products of such plantation, and were stored thereon, and in the possession of the claimant's agents.

2. In December, 1862, this said sugar and molasses were seized by the military forces of the United States, and turned over to a military commission, known as the sequestration commission, on the 12th of January, 1863. The commission was directed by general order No. 8, Department of the Gulf, "to sell at public auction all property in its possession that has not been or may not be claimed or released, except such as may be required for the use of the army, and turn over the proceeds thereof to the chief quartermaster." The said sugar and molasses were then in the possession of the commission. On the 4th of February, 1863, the commission caused the same to be sold, with other property, at public auction in New Orleans. By the accounts kept by the commission, it appears that the net proceeds of the sugar and molasses amounted to $4,362.23. It does not appear specifically that the proceeds were paid over to the chief quartermaster of the Department of the Gulf; but it appears, and the court find the fact to be, that he received money at various times in the year 1863 from the sales of sugar and molasses in New Orleans, to the amount of $33,796.02. For this amount the chief quartermaster accounted on the final settlement of his accounts, and the same was credited by the Secretary of the Treasury to the abandoned and captured property fund in the treasury.

3. That, as appears from the accounts of the chief quartermaster, the said amount of $33,796.02 was received by him as the net proceeds of sales of sugar and molasses in New Orleans, and the whole of said amount was received in and subsequent to the month of February, 1863. That it does not appear what became of the fund resulting from the said sale of claimant's sugar and molasses, unless the same was paid over to the chief quartermaster of the Department of the Gulf, in pursuance of said order of General Banks, and was included in said sum of $33,796.02.

4. On June 13, 1863, the said commission notified the agent

of Mrs. Walter Pugh, wife of the claimant, who had applied for the release of a portion of the said proceeds, that the application was denied.

Upon these facts the claimant had judgment for $4,362.23. The United States thereupon appealed to this court.

*Mr. Assistant Attorney-General. Smith* for the appellant.
*Mr. Edward Janin, contra.*

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

Two questions are presented by the finding of facts in this case, to wit: —

1. Does the Abandoned and Captured Property Act, as extended by the act of July 2, 1864 (13 Stat. 375), authorize a recovery in the Court of Claims for the proceeds of property captured and sold by the military authorities, without judicial condemnation, after July 17, 1862, and before March 12, 1863, but accounted for and credited by the Secretary of the Treasury to the abandoned and captured property fund, in the treasury?

2. Does it appear that the proceeds sued for in this case were actually paid into the treasury?

The first of these questions has been often the subject of consideration in the Court of Claims, but has never, until now, been brought here for determination. It was first decided adversely to the United States as early as 1867, in *Barringer's Case* (3 Ct. of Cl. 358); and although that court has ruled the same way many times since, no appeal was taken by the government until the rendition of this judgment in 1876. Under these circumstances, we ought not to disturb what may fairly be considered a rule of decision in that court acquiesced in by the United States, unless the error is manifest.

The Abandoned and Captured Property Act was undoubtedly intended to be prospective only in its operation. It provided the mode by which that class of property was thereafter to be collected and disposed of, and directed what should be done with the proceeds. By the act of July 17, 1862 (12 Stat. 589), the seizure of certain kinds of property owned by those engaged in the rebellion, and an application of the property or its pro-

ceeds to the support of the army of the United States, were authorized. This act contemplated, however, a condemnation of the property by judicial proceedings *in rem* instituted in the name of the United States in some court having jurisdiction of the territory within which the property was found, or to which it might be removed. The title did not pass by a seizure under the authority of this act until a decree of condemnation was rendered.

The sixth section of the Abandoned and Captured Property Act made it the duty of every officer or soldier of the army of the United States who took or received any abandoned property, or cotton, sugar, rice, or tobacco, from persons in the insurrectionary districts, or who had it under his control, to turn it over to the treasury agent provided for in the act, and take a receipt therefor. As the property captured in this case had been sold by the sequestration commission before this act took effect, no question arises as to whether, after the act did take effect, the property should have been turned over to the proper treasury agent, or proceeded against for condemnation under the act of 1862. Having been converted into money by the action of the capturing military authorities, without judicial condemnation, there was nothing left for the treasury agent to do ; and as the property had been released from custody, there could be no proceeding against it *in rem.*

By sect. 3 of the act of July 2, 1864, sects. 1 and 6 of the Abandoned and Captured Property Act were extended so as to include every description of property mentioned in the act of 1862. This has been supposed by the Court of Claims to give that court jurisdiction over cases for the recovery of money actually paid into the treasury as the proceeds of property captured after July 17, 1862, and before March 12, 1863. *Barringer's Case, supra ; Mrs. Minor's Case,* 6 Ct. of Cl. 393 ; *Terry Carne's Case,* 8 id. 277 ; *Miss Moore's Case,* 10 id. 375. It is also understood to have been the practice of the executive departments of the government from the beginning to credit the abandoned and captured fund in the treasury with the proceeds of all property captured after July 17, 1862, and before March 12, 1863, paid over to the quartermasters, and accounted for by them in their settlements with the Treasury Department.

No distinction was made in this particular between captures after March 12, 1863, and those before. It is a familiar rule of interpretation that in the case of a doubtful and ambiguous law the contemporaneous construction of those who have been called upon to carry it into effect is entitled to great respect. *Edward's Lessee* v. *Darby*, 12 Wheat. 210. While, therefore, the question is one by no means free from doubt, we are not inclined to interfere, at this late day, with a rule which has been acted upon by the Court of Claims and the executive for so long a time. Besides, the interpretation which has been given the act is in strict accordance with the well-settled policy of the government not to enforce the right of capture during the late war against the property of the inhabitants of the insurrectionary districts without giving the owners an opportunity of proving in a court of justice that, although they were in law enemies, they were in fact friends of the United States. Under the act of 1862 this proof might be made in the suit for condemnation, and under the Abandoned and Captured Property Act, in a suit instituted to recover the proceeds in the treasury. Under these circumstances, it can hardly be considered a forced construction of the act of 1864 to hold, as has been done, that it was intended to subject the proceeds in the treasury, of property captured after July 17, 1862, and sold without judicial condemnation before March 12, 1863, to the same suits that were allowed in cases of captures and sales after that date. If this practice is not supported by the exact letter of the law, it is by the spirit, and it is certainly just. We are not disposed to change it.

The second question presents for consideration a subject of much importance connected with the practice under our rule, in reference to appeals from the Court of Claims, which requires " a finding " by that court, " of the facts in the case established by the evidence, in the nature of a special verdict, but not the evidence establishing them." The ultimate fact to be determined in this case is whether the proceeds of the sale of the captured property belonging to the claimant have been paid into the treasury. No direct proof to that effect has been given, but if shown at all, it is by way of inference from certain circumstantial facts which have been established by the evi-

dence. These circumstantial facts are set forth in the finding which has been sent here as the finding upon which alone the judgment was rendered, and as the case stands, the question we are to decide is whether those facts are sufficient to support the judgment. Confessedly, the court has found all the facts which have been directly established by the evidence. These facts are not evidence, in the sense that evidence means the statements of witnesses or documents produced in court for inspection. They are the results of evidence, and whether they establish the ultimate fact to be reached is, if a question of fact at all, to say the least, in the nature of a question of law. If what has been found is, in the absence of any thing to the contrary, the legal equivalent of a direct finding that the proceeds of this claimant's property have been paid into the treasury, the judgment is right. Otherwise, it is wrong. The inquiry thus presented is as to the legal effect of facts proved, not of the evidence given to make the proof; and the question of practice to be settled is whether, under our rule, the judgment of the Court of Claims as to the legal effect of what may, perhaps not improperly, be called the ultimate circumstantial facts in a case, is final and conclusive, or whether it may be brought here for review on appeal.

From what is said in *Ross' Case* (12 Ct. of Cl. 565), and by the reporters in a note (11 id. 344), we are led to suppose that the Court of Claims understands that our decisions in *United States* v. *Ross* (92 U. S. 281) and *Intermingled Cotton Cases* (id. 651) leave this question somewhat in doubt. To avoid misapprehension in the future, we take this opportunity to say that we not only think such a judgment may be reviewed here if the question is properly presented, but that when the rights of the parties depend upon circumstantial facts alone, and there is doubt as to the legal effect of the facts, it is the duty of the court, when requested, to so frame its findings as to put the doubtful question into the record. This would not require us on the appeal to decide upon the weight of evidence. That is done in the court below, when the particular fact is found which the evidence tends to prove. The effect of mere evidence stops when the fact it proves is established. After that the question is as to the effect of the fact; and when the evidence

in a case has performed its part and brought out all the facts that have been proved, these facts thus established are to be grouped, and their legal effect as a whole determined. If the case could come here in such a form as to require us to consider the evidence, we should be required to trace the evidence to its logical results, find in this way all the facts that had been proven, and then declare the final legal conclusion. The rule relieves us from the necessity of considering the evidence at all, and confines our attention to the legal effect upon the rights of the parties of the facts proven as they have been sent up from the court below. In this way the weight of the evidence is left for the sole consideration of the court below, but the ultimate effect of the facts which the direct evidence has established is left open for review here on appeal. The position which the case occupies when it comes here under such circumstances is precisely the same as it would be if the facts, instead of being found by the court, had been agreed upon by the parties, and their agreement embodied in the record.

In *United States* v. *Crusell* (14 Wall. 1), the question was whether the particular facts found justified the conclusion that the money sued for had been paid into the treasury; and inasmuch as the legal presumption is, in the absence of any thing to the contrary, that the officers of the government perform their duties when called upon to act in their official capacities, we thought that the law would infer from the facts found that the money which ought to have been paid over by a quartermaster to his superior officer was actually paid over, and that in this way it had reached the treasury. So in *Intermingled Cotton Cases* (*supra*), when it was found that the cotton of the several claimants contributed to and formed part of the captured mass from which the cotton sold was taken, we concluded that the claimants were entitled to their respective shares of the money in the treasury as the proceeds of the sale. In *United States* v. *Ross* (*supra*), however, we thought a similar conclusion from the particular facts there found was too remote, and so reversed the judgment and sent the cause back for a new trial. The premises we considered too uncertain to justify the inference that had been drawn. We thought independent and material facts were wanting, and that the law would not

raise the presumption from what did appear that the plaintiff was entitled to recover. The difficulty in that case was not as to the power of this court to act upon the facts as found, but as to the sufficiency of the facts to support the judgment.

Upon the facts found in this case we have no difficulty in presuming that the money sued for is in the treasury, within the meaning of the Abandoned and Captured Property Act. The sequestration commission was directed to sell captured property, and turn the proceeds over to the chief quartermaster. The property in question was sold, and an account of sales stated by the commission. The case shows that at various times during the year 1863 the chief quartermaster received from the commission the proceeds cf sugar and molasses sold, amounting in the aggregate to $33,796.02, and that this amount was all duly accounted for to the treasury, and there passed to the credit of the fund. This has always been treated in that department as equivalent to an actual payment into the treasury. In June, 1863, the commission refused the application of the wife of the claimant for a restoration of the proceeds. This raises the presumption that down to that time the money had not been released ; and as it is specially found that it does not appear what did become of the money unless it was paid over, as it should have been, to the chief quartermaster, we think the law will presume it was disposed of as the order of the commanding general required it should be. If any evidence to the contrary exists, the burden was cast upon the United States to produce it. Until the presumption in favor of the claimant is repelled, the law gives him the right to the judgment he has obtained.

*Judgment affirmed.*