OPINION.
Bichabdson, J.,
delivered the opinion of the court:
When this case was first submitted at a former term of the court it was upon demurrer to the claimants’ petition, and the single question then considered was whether or not the method of computing commissions on stamps sold to proprietors of matches and other proprietary articles who furnished their own dies, adopted and long followed by the Internal Revenue Bureau and Treasury Department, should be sustained.
Without at that time expressing an opinion as to the correctness of the rule, in passing judgment upon the demurrer, and without then much considering it, but regarding it, if not clearly correct, at least not free from ambiguity and doubt, we felt, on the authority of Mrs. Alexanders Case (12 Wall., 177) and Pugh's Case (99 U. S. R., 265), that we were not authorized to overthrow a construction of the statute so long acquiesced in by all parties concerned, in transactions of such great magnitude, and involving such large pecuniary interests, and we therefore sustained the demurrer.
Upon appeal, the Supreme Court, apparently from the course ofthe argument at the hearing there, and certainly not from any concession ever made by the officers of the Internal Revenue Bureau, or by any other officers of the Treasury Department regarding it as “ virtually admitted that the contention on the part of the appellant [the claimant] upon the provisions of the statutes is correct,” held, as has often been held by that court and by this, that “the rule which gives determining weight to contemporaneous construction put upon a statute by those charged with its execution applies only in cases of ambiguity and doubt.” Applying the rule to the case as virtually admitted in the Supreme Court, the judgment of this court on' demurrer was reversed. (105 U. S. R., 691.) It could not have been otherwise under those circumstances, when the contention *57 of the officers of the Treasury Department was thus abandoned.
In point of fact the officers of the Internal .Revenue Bureau and of the Treasury Department charged with the execution of the law have always strenuously maintained that the rule adopted by them was in accordance with the will of Congress as shown by the course of legislation.
The first internal-revenue act passed, July 1,1862, authorized the Commissioner to sell adhesive stamps therein provided for, and to make an allowance to purchasers of not exceeding 5 per cent, as “commission,” with a proviso that proprietors of the proprietary articles named, who should furnish their own dies or designs, should be allowed a “discount” of 5 or 10per cent., according to the amounts jmrchased. (12 Stat. L., 477. §102, ch. 119.)
Thetwo words, “ commission” and “discount,” are not synonymous. They are similar, but not identical. “Commission,” in its technical as well as in its ordinary sense, generally signifies a percentage upon the amount of money involved in the transaction, as distinguished from “discount,” which is a percentage taken from the face value of the security or property negotiated. (Bouvier’s Law Dictionary, under “Commissions”; Ficklin’s National Arithmetic, 2d Book Advanced, paragraph 356, and other standard mathematical works.)
The Commissioner of Internal Revenue understood that Congress intended to use the two words in their distinct significations, as expressing two distinct methods of allowance. Accordingly, when he issued his first circular, after the Bureau was fairly organized, on the 12th of January, 1863, he gave notice that a commission would be allowed on adhesive stamps of 2 per cent, on purchases of $50, 3 per cent, on $100, 4 percent. on $500, and 5 per cent, on $1,000, payable in stamps. (Bontwell’s Direct and Excise Tax System, 391.) This language did not artistically express the idea of “commission,” but such was its practical effect. A percentage on the face value of stamps, payable in stamps, exactly equals a percentage on the money involved in the transaction, and so is strictly and technically a “ commission.”
No reference was madein this circular to the sale of proprietary stamps, and it seems to have been understood that Congress intended to apply to them a different rule of allowance.. *58 But in less than two months, on the 3d of March, 1863, Congress, by express enactment, changed the word “ discount” in the Act of 1862 to “ commission,” by striking out the one and inserting the other, at the same time providing for a uniform commission of 10 per cent, on the whole amount, instead of 5 per cent, on small and 10 per cent, on large purchases. (12 Stat. L., 718, eh. 74.)
This change of percentage in the allowance for the i>urchase of proprietary stamps from “discount ” to “commission” certainly appears to have been made for the sole purpose of altering the law and sanctioning the construction given by the Commissioner, otherwise it was of no practical effect. If the percentage was to be deducted from the face value of the stamps after the word “commission” took the place of “discount,” then it was discount still, and the express alteration of the statute made no change in the law, and was as idle and useless in practical effect as it was inappropriate and inaccurate in language.
Whether or not the whole phraseology of the section of the statute was aptly chosen in every particular to express the correct idea of commission, it can hardly be conceived that Congress intended to allow discount after having stricken out that word and put in its place one susceptible of a different signification.
The Internal Revenue Bureau and the officers of the Treasury Department very naturally regarded the change in language as effecting a change in the law, and they have ever since allowed purchasers of proprietary stamps, who furnished their ■own dies, nob a “ discount” from the face value of the stamps purchased, but a “ commission ” computed on the amount of money involved in the transaction, and all the dealings of the parties have been in that more accurate form of account instead of by the formula of “ payable in stamps,” as the findings show.
This construction was acquiesced in by purchasers of proprietary stamps without objection after the year 1866 to near the time of bringing this action.
The decision of this case as it is now before us does not necessarily turn upon the correctness of the practice of the Treasury Department in the method of computing commissions, and •we have thus reviewed the subject in order to show that the *59 officers charged with the duty of administering- the law from its first enactment to the present time have acted not without reason and due consideration, nor without the apparent sanction of Congress.
Upon the right to recover at the trial on the demurrer the Supreme Court had before it only the petition of the claimant, admitted by the demurrer to be true for the purposes of that hearing. Of this they say, “ The case made by the petition is not that of successive and independent purchases of stamps, settled for at the time when the commissions given by the law were paid by the Commissioner, the purchaser voluntarily accepting payment, not in money, but in other stamps; and new dealings of the same character, but separate as to each instance, had, afterwards, upon the same footing and by mutual understanding. On the contrary, the business was conducted upon the footing of a running account.”
The court further say that the dealing as presented by the petition “ does not prove that he [the proprietor] was willing to waive his right to a commission upon the stamps so purchased. And it would be incumbent on the Government, in order to deprive him of his statutory right, not only to show facts from which an agreement to do so might be inferred, but an actual settlement based upon such an understanding.”
Since the final decision upon the demurrer, the defendants have had leave to answer over and have filed a plea of general issue, and the real facts have been proved by the parties and found by the court, and we are now called upon tp apply to these facts the rules of law laid down by the Supreme Court.
It now appears from these findings that the dealings of the parties disclose a case not only entirely different from, but exactly the opposite to that implied from the allegations in the petition alone upon which the Supreme Court was then called upon to pass judgment. It is shown that those dealings were successive and independent purchases, upon written orders fulfilled by the delivery of stamps of the face value of 10 per cent, .more than the money order; that in each case those stamps were received and receipted for by the claimant in satisfaction of the order; that within sixty days each order was paid for on that basis; that there was no running account beyond sixty days’ credit, or beyond the monthly settlements which were made on the basis of the orders and correspondence and upon *60 tbe returns signed by the claimant and forwarded to the Commissioner, and that the accounting officers made frequent statements of balances on the same basis.
The Supreme Court say, “It would be incumbent on the Government not only to show facts, from which an agreement might be inferred, but an actual settlement based upon such an understanding.”
In our opinion the Government has now done both. The written contract set forth in the bond (Finding II) was that the claimant corporation should on or before the tenth day of each and every month make a statement of their account upon Form 55.}, showing the balance due at the commencement of the month, the amount of stamps received, and the amount of money remitted by it during the month, and the balance due from it at the close of the month next preceding; and also that the company should pay all and every sum or sums of money it might owe the United States for stamps delivered or forwarded to it “ according to their request or order, within the time prescribed for payment for the same according to law;” that is, each purchase was to be paid for within sixty days of delivery of the stamps.
The statute fixed a limit to the term of credit for each purchase, and this agreement fixed in addition thereto the terms of settlement, not payment merely, but an accounting between the parties, an accord and satisfaction. So the parties always did their business from the commencement without objection on the part of the claimant for nearly nine years and until this action was about to be instituted. We will review the course of business.
Each purchase of stamps was upon a written order, separate and distinct from all other purchases. The claimant ordered, say, “three thousand dollars’ worth of match stamps,” as shown in paragraph 1 of Finding III. The Commissioner thereupon forwarded stamps of the face value of $3,300, with a letter stating that they were in satisfaction of the order referred to (paragraph 2 of Finding III), and the claimant, in writing signed by its proper officer, returned an acknowledgment of the receipt of stamps of the face value of $3,300, in satisfaction o£ the order for three thousand dollars’ worth of stamps. (Paragraph 3 of Finding III.)
These are facts from which an agreement may not only be *61 inferred, but which must be held to constitute an explicit contract, a sale and purchase at a price fixed and agreed upon by the parties.
The course of business subsequent to the delivery of stamps and to the acknowledgment by the claimant, reaffirms the contract as thus understood by the parties. The claimant was to pay for each delivery within sixty days, and so it always did. At the end of each sixty days after the fulfillment of an order that order was invariably paid.
In one sense there was a running account for sixty days; that is, as to terms of payment. After the first order was given, and before the sixty days for payment had expired, there were many intervening orders of like kind. It was not convenient to send a separate remittance of money in payment for each separate delivery of stamps, when, as the findings show, more than sixteen hundred such deliveries were made, and the claimant accordingly made remittance in sums to suit its own convenience, taking care always that fullpayment shouldbe effected before the term of credit on any one order had expired. If at any time a remittance covered more than was payable at its date, it was practically a payment of what had matured, and the balance went towards payment of the next maturing order. In so large a business the parties did not stop to adjust each transaction separately. But they did settle each month, as we have shown; and such settlements were recognized by the correspondence had upon each remittance of money, as well as agreed upon in the bond, and were regularly made every month throughout the whole period of nine years. In acknowledging each remittance the Commissioner gave the claimant credit for the money remitted, with 10 per cent, added thereto as commissions, and authorized it “ to take credit for the above amount on Form 55\ for the current month,” as shown by paragraph 5 in Finding III.
As to periods of settlement, accord, and satisfaction, we may therefore consider that there was a running account for each period of one month, as appears from the specimen monthly account-current set forth in paragraph 10 of Finding III. These accounts-current were regularly sent forward to the accounting officers, and by them adjusted and balances stated from time to time in accordance with the practice of the Treasury Department, of which the claimant had due notice.
*62 There was not swell a general running account between these parties for the period of nine years from the commencement of theirdealings as entitles the claimant to a statementof its whole account for that time, opening its own monthly settlements and the settlements of the accounting officers, setting aside its own, sixteen hundred contracts, and making to it a greater allowance than was from time to time agreed upon, even if it would have been entitled to such greater allowance had it not otherwise contracted.
In our opinion, under the rules laid down by the Supreme Court in this very case, a,s well as in the case of Francis B. Pray, decided by that court at the present term (106 U. S. B., 594), the claimant corporation is concluded by its own agreements and settlements; that it has no cause of action, and that its petition must be dismissed.
In this result the claimant suffers no injustice. It is to be presumed from its long acquiescence in paying for stamps in the manner and to the extent shown by the findings, that it added the whole amount thus paid in taxes to the value of its articles manufactured, and charged the same to the purchasers. If so, the consumers finally paid the taxes, while the money recovered back, if any, would go not to the consumers, but to the claimant as extra and unexpected profits.
Judgment will be entered dismissing the petition.