FRED HEWITT *vs.* EMIL SCHULTZ, *et al.*

Opinion filed May 27th, 1898.

**Public Lands—Indemnity Grants—Withdrawal.**

> Congress did not take from the land department the power of withdrawal with respect to lands within the indemnity limits of the grant to the Northern Pacific Railroad Company. Accordingly, *held*, that a patent based upon an entry of land within such limits after the withdrawal thereof by the acting commissioner of the general land office was void.

Appeal from District Court, Sargent County; *Lauder*, J.

Ejectment by Fred Hewitt against Emil Schultz and Friederika Schultz. Plaintiff had judgment, and defendants appeal.

Reversed.

*Ball, Watson & Maclay, James B. Kerr*, and *J. B. McNamee*, for appellants.

The patent issued to plaintiff is void. The land falls within the exception to section 2258, Rev. Statutes of U. S., it being included in a reservation by proclamation of the president. Where the executive officers of the government attempt to dispose of lands under the pre-emption law which are contained within the terms of the exceptions to Revised Statutes, section 2258, their acts are without jurisdiction and void. *Burfenning* v. *C. St. P. M. & O. Ry. Co.*, 163 U. S. 321, 16 S. C. Rep. 1018. The officers of the land department have authority to withdraw from the operation of the general land laws of the United States lands otherwise open to acquisition under those laws. *Wolcott*, v. *Des Moines Co.*, 5 Wall. 687; *Wolsey* v. *Chapman*, 101 U. S. 755; *Riley* v. *Welles*, 154 U. S. 578, and a patent issued to a pre-emptor for lands which have been so withdrawn is void. *Spencer* v. *McDougal*, 159 U. S. 62; *N. P. R. R. Co.* v. *Musser, etc. Co.*, 19 Sup. Ct. Rep. 205. The land department have authority to withdraw indemnity lands on definite location. *Thompson* v. *N. P. Ry. Co.*, 83 Fed. Rep. 546. The legislative withdrawal under the provisions of section 6 of the act of July 2, 1864, of lands within forty miles of

the line of the N. P. Railroad upon filing the map of general route, was not intended by congress to be exclusive of any authority in the land department to withdraw lands in the indemnity belt after definite location. *Thompson* v. *Ry. Co.*, 83 Fed. Rep. 546. The opinion of the secretary of the interior (19 L. D. 89) that the preliminary withdrawal by congress shows an intention to exclude all subordinate authority is wrong and based upon a misapprehension of the purposes for which the withdrawal on general route was provided. The withdrawal on general route was ample to protect the company until the definite location of its line, when its present grant of place lands took effect and the limits of its indemnity belt became fixed. When this point was reached the function of the withdrawal on general route was fulfilled and at the same time by the terms of the grant the right of selection of indemnity arose, the direction of which was expressly committed to the secretary of the interior. *Wood* v. *Beach*, 156 U. S. 549. The Northern Pacific land grant has been considered and construed. *N. P. Ry. Co.* v. *St. P. M. & M. R. Co.*, 26 Fed. Rep. 551; *Buttz* v. *N. P. R. Co.*, 119 U. S. 55. Plaintiffs patent is voidable, if not absolutely void and the legal title is held in trust for defendants. Where through an erroneous construction of the law, the land department awards to one the patent for lands which another has initiated a prior right, the courts will correct the error and hold the patentee trustee for him who has the better right. *St. P. etc. R. Co.* v. *Winona, etc. R. Co.*, 112 U. S. 720; *Southern Pac. R. Co.* v. *Wiggs*, 43 Fed. Rep. 333; *Ard* v. *Brandon*, 156 U. S. 536; *Johnson* v. *Towsley*, 13 Wall. 72; *Shepley* v. *Cowan*, 91 U. S. 330; *Moore* v. *Robbins*, 96 U. S. 530. The railroad company selected the land before plaintiff acquired any right whatsoever, for the land was reserved when he applied to enter, and after selection made, no adverse claim could attach. *Rudolph Nemitz*, 7 L. D. 80; *St. P. R. Co.* v. *Meyer*, 9 L. D. 250; *N. P. R. Co.* v. *Halvorsen*, 10 L. D. 15; *Lane* v. *St. P. R. Co.*, 10 L. D. 454; *Flippen* v. *S. P. R.*

*Co.*, 14 L. D. 418; *Sawyer* v. *N. P. R. Co.*, 12 L. D. 450; *Sage* v. *Swenson*, 67 N. W. Rep. 544.

*Pierce & Austin*, for respondent.

The land in question was not granted to the railroad company by its charter, but was land within the indemnity limits named in the charter as to which the company had a contingent right of selection. "The granting act not only did, not authorize a withdrawal of lands in the indemity limits but forbade it." It was explicitly provided that the provisions of the pre-emption and homestead laws should be extended to all other lands on the line of the road when surveyed "excepting those hereby granted to said company." If lands within the indemnity limits are to be regarded as on the line of said road this declaration is prohibitory of any withdrawal for the benefit of the road. *N. P. R. Co.* v. *Miller*, 7 L. D. 100; *N. P. R. Co.* v. *Fugelli*, 10 L. D. 288; *Spicer* v. *Ry. Co.*, 10 L. D. 440; *Davis* v. *Ry. Co.*, 19 L. D. 87; *N. P. R. Co.* v. *Sanders*, 46 Fed. Rep. 250. By section 6 of the act of July 2d, 1864, (13 Stat. 365,) it is provided that when surveyed, the indemnity lands should be immediately liable to selection by the company and that the lands not previously selected should be appropriated to the first legal applicant under the pre-emption and homestead laws. The company made no selection of these lands until five months after the plat of survey thereof had been filed in the local land office. Hewitt settled upon and improved the tract involved six months before the plat of survey was filed, and he filed his declaratory statement four months before the railroad company filed its list of selections. Being prior in time, he is prior in right. *Shepley* v. *Cowan*, 91 U. S. 330; *S. P. R. Co.* v. *Meyer*, 9 L. D. 250. The person first appropriating land has the best title in equity. *Taylor* v. *Brown*, 5 Cranch. 234; *Stark* v. *Starrs*, 6 Wall. 402. It is contrary to the settled policy of congress that indemnity lands should be withdrawn from entry by actual settlers for an indefinite time. *N. P. Ry. Co.* v. *Sanders*, 46 Fed. Rep. 248. The charter of the company

as to all public lands referred to in it gave preference to the pre-emptors and homestead settlers down to the time when "the line of said road was definitely fixed." *Wood* v. *Beach*, 156 U. S. 543. Upon the filing of the map fixing the line of the road, the law withdrew from settlement the granted lands situated within the original grant. *Butts* v. *N. P. R. Co.*, 119 U. S. 71. Congress intended to give to actual bona fide settlers priority over the railroad company. *Ry. Co.* v. *Greenhalgh*, 26 Fed. Rep. 568. The selection of indemnity lands passed no title to the railroad company until approved by the secretary of the interior. *Grandin* v. *La Bar*, 3 N. D. 446, 57 N. W. Rep. 243. When an official executive act remains to be done before a patent could issue the legal and equitable title remains in the United States. *Wis. Cent. R. Co.* v. *Price Co.*, 133 U. S. 496; *Jackson* v. *LaMoure Co.*, 1 N. D. 239; *Barden* v. *Ry. Co.*, 154 U. S. 321; *Ry. Co.* v. *Ry. Co.*, 112 U. S. 421.

CORLISS, C. J.   The plaintiff has brought ejectment to recover from the grantees of the Northern Pacific Railroad Company the possession of a quarter section of land situated within the indem-. nity belt of the land grant of that corporation.   His pre-emption settlement upon the land was made after the same had been withdrawn from entry by the acting commissioner of the general land office.   Following certain rulings of the land department that the withdrawal was void, the secretary of the interior, affirming the decision of the commissioner, held that, despite such withdrawal the plaintiff's final proof should be received; and thereafter a patent was issued to him.   the defendants attack the validity of this patent, claiming that it is absolutely void, because the entry was made upon lands which were, on account of the withdrawal, no longer open to entry.   They predicate this contention upon the proposition that the withdrawal referred to was legal, and operated to place the land in question beyond the reach of private settlement.   That the patent is void if the position taken by the defendants be sound would not seem to admit of doubt. Nor is the point seriously contested by counsel for plaintiff.   If

the withdrawal was valid, then the land was land included within a reservation by the proclamation of the president, and was therefore not subject to entry. Rev. Statutes, U. S. 1878, section 2258. That a withdrawal by the commissioner of the land office is a withdrawal by proclamation of the president was distinctly held in *Wolsey* v. *Chapman*, 101 U. S. 755. Where the land entered is not subject to entry, the patent is void. *Burfenning* v. *Railroad Co.*, 163 U. S. 321, 16 Sup. Ct. 1018. We are therefore brought face to face with the question—the crucial question in the case—whether, in view of the peculiar provisions of the land grant to the Northern Pacific Railroad Company, the executive branch of the government had any authority to withdraw from entry any of the lands within the indemnity belt of such grant. It is essential to an intelligent discussion of this question that we should quote two sections of this granting act,—sections 3 and 6. Section 3 declares "that there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific Coast, * * * every alternate section of public land not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof the United States have full title not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office; and whenever, prior to said time, any of the said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted or otherwise disposed of, other lands shall be selected by the secretary of the interior, in alternate sections and designated by odd numbers not more than ten miles beyond the limits of said alternative sections." Section 6

provides: "That the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale or entry, or pre-emption before or after they are surveyed, except by said company as provided in this act; but the provisions of the act of September, eighteen hundred and forty one, granting pre-emption rights, and the acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May 20, eighteen hundred and sixty-two, shall be, and the same are hereby, extended to all other lands on the line of said road when surveyed, excepting those hereby granted to said company. And the reserved alternate sections shall not be sold by the government at a less price than two dollars and fifty cents per acre when offered for sale." 13 Stat. 365.

In construing these enactments, we must keep steadily in mind the fact that congress well knew that the power of withdrawal was vested in the executive branch of the government. See *Wolcott* v. *Des Moines Co.*, 5 Wall. 687; *Wolsey Chapman*, 101 U. S. 755; *Riley* v. *Welles*, 154 U. S. 578, 14 Sup. Ct. 1166; *Spencer* v. *McDugal*, 159 U. S. 62, 15 Sup. Ct. 1026; *Northern Pac. R. Co.* v. *Musser-Sauntry Land, Logging & Mfg. Co.*, 18 Sup. Ct. 205. Secretary Vilas, in his opinion in the Miller case, 7 Land Dec. Dep. Int. 100, holds that section 6, both by implication and by express provision, takes from the executive branch of the government the well recognized and frequently exercised power of withdrawal with respect to land within the indemnity limits of the grant contained in the statute. We fail to discover any force in his reasoning upon either point. So far from the first portion of the section creating an implication that no power of withdrawal should ever be exercised by the officers of the land department or by the president, we think that the implication is exactly the reverse. Why did congress embody in that section

the provision that, after the general route should be fixed, the odd sections should not be liable to entry, etc.? The reason is perfectly obvious when we turn back to section 3, and examine its provisions in connection with those of section 6. Two distinct acts were to be performed by the corporation in securing title under this grant. It must first fix its general route. Subsequently it must file its map of definite location. Between these two periods, which might be separated by years of time, settlers would naturally be attracted to the land along such general route, and the company might find, by the time its map of definite location was filed, that so numerous were the settlements upon the lands embraced within the grant that the value of the grant had been seriously impaired. Under section 3, the company must take the land subject to all entries upon the odd sections made prior to the filing of the map of definite location, and therefore subject to all entries intermediate the fixing of the general route and the filing of such map. Congress plainly saw that, unless settlement during this period was prevented, an extraordinary influx of population might so reduce the acreage of the grant that the indemnity land would not suffice as a means of adequate indemnity. There was power, it was true, in the officers of the land department to withdraw from settlement this land within the place limits after the general route had been fixed. But the hazard to the company was deemed too great to leave in a state of uncertainty—to intrust to the discretion of a public official—that which could be easily settled in the law itself; and accordingly, to preclude all possibility of a great tide of immigration ingulfing and sweeping away much of the grant which it was intended the company should enjoy, congress itself erected the dike which was to keep out this anticipated flood. It is strange, indeed, that such a precaution should ever have been thought by a rational mind to indicate by implication a legislative purpose to take from the land department the conceded power of that department to extend to the company within the indemnity limits a similar protection in case of need. The feature of this grant to the Northern

Pacific Railroad Company, which stands out in bold relief, is the purpose of the federal government to give to the company, as an equivalent for the tremendous financial hazard of constructing a great railway system through a vast stretch of unsettled territory, and over almost impassible mountains, a grant of land which, in any event, should equal in area the amount it would receive were every odd section specified in the grant free from claim at the time its map of definite location should be filed. Congress intended that the grant should be, in substance, a grant in quantity; and, to the end that it might keep its word of promise to the hope as well as to the ear, it carefully guarded against the material diminution of the acreage of the grant by settlements intervening between the time when the company should file its map of general route and the time when it should file its map of definite location. We would little expect from such legislation to find the same body, in one and the same branch, taking from the land department the old and often exercised power of withdrawal, when to do so would subject the grantee to the hazard of losing a portion of its grant,—the very hazard from which such body had so carefully guarded the grantee in the preceding sentence. Why in this particular case such power should be withheld it is impossible to discover. If congress intended in good faith to see to it that the full grant should ultimately accrue to the company, it is incredible that it should, without any explicable reason therefor, take from the land department a power so necessary to the accomplishment of that purpose as the power of withdrawal. Even if the statute were not clear in meaning, it would be disgracefully derogatory to the honor of the United States to assume that in a covert way congress intended to impair the value of the grant by enacting, in the disguise of ambiguous language, that the land department should not be permitted to defend the grant by the exercise of the well known power of withdrawal. It is not difficult to ascertain why the last clause of section 6 was passed. In 1862, two years before the grant to the Northern Pacific Railroad Company, congress had extended the pre-

emption rights to unsurveyed lands. 12 Stat. 413. It readily saw that, the moment the general route was fixed a strong current of population might, and probably would, flow in the direction of the adjoining lands within the place and the indemnity limits, practically all of which lands were unsurveyed. Under the act of 1862, these settlements would be good although upon unsurveyed lands, provided they were not made upon odd sections within the place limits. In the indemnity belt they would all be good, without reference to the number of the section. Thus, it might happen that long before the lands could be surveyed, and therefore long before the time could arrive when the company would know what lossess it had sustained by reason of prior settlements and in other ways, and therefore be in position to make selections, this fund of real estate out of which these losses were to be made good would be wrested from the company by prior pre-emption entries. Congress plainly saw that it would be unjust to the company to leave the general provisions of the act of 1862, that a pre-emptor could initiate his rights on unsurveyed land, in force as to the indemnity lands; and hence it declared in terms that those provisions should apply only after the land had been surveyed. Therefore, under ordinary circumstances, the company could protect itself, as it would, as a rule, make its selections before private settlements could be made. But, in the event that a withdrawal should at any time become necessary, the power of withdrawal was, we are clear, to be exercised as in other cases. For other reasons, equally forcible to the mind of the statesman, congress placed all lands (except the odd sections in the place limits which were withdrawn absolutely, whether surveyed or not) in the same category. The odd sections in the indemnity limits were not to be opened to settlement until surveyed, that the company might be protected; and the other sections in both limits were not to be opened to settlement, that the settlers themselves might be protected. It would certainly be an unwise policy to tempt people upon unsurveyed lands, with the inevit-

able risk of finding in many cases, after survey, that they had settled upon property—*i. e.* odd sections within the place limits—belonging to the railroad company, and which, therefore, they could not hold.

When we bring to the interpretation of this law a spirit large enough for the task, and do not spend our ingenuity in an endeavor to force into some hidden meaning, we find no difficulty in discovering that congress never dreamt of taking away the power of withdrawal. We read in every line of the statute an unmistakable purpose to surround the interests of the company with every possible safeguard against the impairment of the grant, on the faith of which it was known that large investments of capital would be risked. Had congress in terms declared that the power of withdrawal should never be exercised as to the indemnity lands, the grant would probably never have been accepted. We do not believe that the capitalists who embarked their money in this enterprise ever believed that this power, whose exercise might become essential to the protection of the integrity of the grant, had been taken away. Where is the language to create such a belief? It is not to be found. Had so radical a change in national policy with respect to public lands been determined upon in this particular case, the phraseology of the act on this point have been explicit. Secretary Vilas has, by ignoring the general spirit of the act and other legislation which throws light upon its interpretation, forced into the law a meaning neither express nor implied,—one which presupposes that congress intended, without any reason for so doing, to depart from an established practice, when there was every reason why it should adhere thereto. Going back in imagination to the time when this law was framed, and taking up our position alongside of the members of the committee whose duty it was to draft it, and bringing to bear upon the question the large views of true statesmanship,—looking to every consideration which should be weighed,— it seems to us, in the light of the language of the statute, that the train of reasoning which passed through the minds of

that committee lies upon the very surface. "We desire that the
company shall lose none of its grant. Therefore we will not
allow it to be subject to losses in the place limits after the gen-
eral route is fixed; and therefore we will not permit settlement
within the indemnity belt until the lands are surveyed, when the
company can for the first time have an opportunity to make
selections for losses; and therefore, in conclusion, we will not
take away the power of withdrawal as to the indemity lands which
power may be found indispensable to the full protection of the
grant in all its integrity." Contemporaneous construction of this
law by the officers of the land department is in harmony with our
views. Down to the time of the decision made by Secretary
Vilas, the whole trend of opinion was in the opposite direction.
More than 40 withdrawals of indemnity land had at that time
been made. The construction of the law by those who are
charged with the duty of executing it has often been deemed very
persuasive. *U. S.* v. *Moore*, 95 U. S. 763; *U. S.* v. *Pugh*, 99 U. S.
269; *U. S.* v. *McDaniel*, 7 Pet. 1; *Railroad Co.* v. *Barnes*, 2 N. D. 383,
51 N. W. Rep. 386; *U. S.* v. *Johnston*, 124 U. S. 236, 8 Sup. Ct. 446;
*U. S.* v. *Philbrick*, 120 U. S. 52, 7 Sup. Ct. 413. The spirit of the
law, the letter of the law, long continued contemporaneous con-
struction of the law by the officers of the land department, the
failure of congress to check by a specific enactment this constant
practice of making such withdrawals, and, finally, the manifest
reason and justice of the case, coupled with the impossibility of
discovering any ground for taking the land in the indemnity belt
of this grant out of the universal rule,—these all combine to
make a conclusive case against the decision of Secretary Vilas
that the power of withdrawal was taken away. Our conclusion,
therefore, is that the withdrawal was legal, and that, therefore,
the plaintiff's patent is void. It follows that he cannot maintain
this action, as he must recover on the strength of his own title.

The judgment of the District Court is reversed, and that court
is directed to dismiss the action. All concur.