**UNITED STATES, Appellee,**

v.

**First Lieutenant William L. CURRY, SSN 529–86–6886, United States Army, Appellant.**

**CM 440853.**

U. S. Army Court of Military Review.

11 Feb. 1983.

702

Captain Gary D. Gray, JAGC, argued the cause for the appellant. With him on the brief were Major Raymond C. Ruppert, JAGC, and Major James F. Nagle, JAGC.

Captain John L. Plotkin, JAGC, argued the cause for the appellee. With him on the brief were Colonel R.R. Boller, JAGC, Lieutenant Colonel John T. Edwards, JAGC, Captain Paul K. Cascio, JAGC, Captain Patrick M. Flachs, JAGC, and Captain Michael E. Pfau, JAGC.

Before HANSEN, O'DONNELL and FOREMAN Appellate Military Judges.

## OPINION OF THE COURT

FOREMAN, Judge:

Contrary to his pleas, the appellant was convicted of eleven specifications of conspiracy; twenty-one specifications involving possession, transfer and sale of hashish and cocaine, and introduction of hashish and cocaine onto a military post; larceny of explosives, pyro-technics, and explosive training devices; and unlawful possession of explosives. The offenses were charged as violations of Articles 81, 92, 121 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 892, 921 and 934 (1976). He was sentenced to a dismissal, confinement at hard labor for thirty years and total forfeitures. The convening authority approved the sentence, but the Secretary of the Army subsequently reduced the period of confinement to seventeen years.

The appellant entered into a stipulation of fact admitting virtually all of the facts upon which the charges were based. The thrust of the defense at the trial level was to contest the admissibility of the evidence rather than dispute the factual basis for the charges. On appeal the appellant contends that he was denied a fair trial by the unreasonable multiplication of the conspiracy specifications and the military judge's denial of a challenge for cause of a court member. He contests the admissibility of the evidence seized from his government quarters and the quarters of a co-conspirator. He asserts that he was prejudiced by the excessive post-trial delay in the processing of his case, and he attacks the validity of the convening authority's action on the findings and sentence. Finally, he asserts that his sentence is inappropriately severe.

I. *Factual Background*

In March of 1980 the appellant entered into an agreement with several enlisted personnel, whereby the co-conspirators, or at least some of them, would travel to the Netherlands, obtain hashish and bring it back to Germany for subsequent transfer and sale to fellow soldiers. A total of five trips were made for this purpose over a two and one-half month period. On the first four trips, both hashish and cocaine were obtained and smuggled into Germany. The fifth trip involved only hashish.

On 12 May 1980, Captain Norman G. Comstock, the appellant's company commander, found an anonymous letter on his desk. The letter stated that the appellant, Sergeant Michael Hicks, Staff Sergeant Fred Jones, Sergeant Gerald Curry, and Specialist Four Larry Crews, all members of Captain Comstock's company, periodically were making trips to Amsterdam, purchasing controlled substances, and returning to the Karlsruhe area where they were selling the drugs to American servicemen. Specialist Four Bryan Monaghan later identified himself as the author of the letter. Monaghan informed Captain Comstock and Sergeant Michael Hamilton, a military police investigator, that he had been told by Hicks and Crews that, together with the appellant and Sergeant Curry, they had made three trips to Amsterdam and obtained controlled substances. Monaghan said that Hicks and Crews told him they brought the drugs back to Karlsruhe,

cut them into smaller units at Hicks' family quarters, and distributed them to servicemen in the Karlsruhe area. Lastly, Monaghan said that Crews had told him that the appellant, Sergeant Curry, Specialist Hicks and Private First Class Kenneth Davis would be going again to Amsterdam on 31 May 1980 to obtain hashish and cocaine and would return to Karlsruhe on the following morning.

Based on this information, Hamilton prepared a "Commander's Authorization to Search" and supporting documents and submitted them to Lieutenant Colonel Oliver Rowell, the deputy community commander, on the evening of 31 May. The community commander, Colonel James van Loben Sels, was unavailable at this time and Colonel Rowell was acting commander in his absence. Colonel Rowell reviewed the material submitted by Sergeant Hamilton and issued a conditional authorization to search Hicks' quarters and to apprehend the appellant, Davis, Crews and Sergeant Curry. The authorization was contingent upon the arrival of those persons at Hicks' quarters on the following morning.

Law enforcement personnel placed Hicks' quarters under surveillance on the morning of 1 June. Another surveillance team observed the appellant and Davis go into Sergeant Curry's quarters, followed shortly thereafter by Sergeant Jones. At this time, Sergeant Hamilton called Colonel Rowell and under oath told him of the changed circumstances and received oral authorization to search Sergeant Curry's quarters and to apprehend those present in the quarters. Hamilton obtained this authorization from Colonel Rowell rather than from Colonel van Loben Sels, who by this time had returned to his quarters, because Hamilton believed that time was of the essence.

Several law enforcement personnel then proceeded to Sergeant Curry's quarters, entered the apartment and apprehended the appellant and other military personnel there. The appellant was observed in the process of cutting and weighing hashish. Sergeant Jones was apprehended with fifteen grams of cocaine in his possession as he

was leaving the apartment building. A large quantity of drugs was found in plain view in the apartment, but none of the drugs were seized at this time. Instead, the apartment was sealed and another authorization to search and seize was obtained from Colonel van Loben Sels. Six kilos of hashish were seized pursuant to this authorization. The hashish in Sergeant Curry's quarters, together with information developed from it, led to the drug charges of which the appellant stands convicted.

On the afternoon of 1 June, Captain Comstock went to the appellant's quarters to inform Mrs. Curry that her husband had been apprehended. He also wanted to obtain a pistol that belonged to the appellant. Accompanied by his own wife and Mrs. Alice R. Amrine, the battalion commander's wife, he went to the appellant's quarters. Mrs. Amrine had volunteered to accompany Captain Comstock out of concern for Mrs. Curry. Comstock told the appellant's wife, "I have to talk to you. This is the hardest thing I've ever done to tell a wife this." The appellant's wife asked, "Well, what has he done now?" Comstock explained what had happened and she replied, "Well, I knew he was up to something." In Comstock's opinion, the appellant's wife was not upset or angry; she appeared neutral and did not "go to pieces." Comstock then asked where the pistol was. The appellant's wife said, "I don't know. I haven't seen it around for awhile. I told Bill [the appellant] to get rid of it." Mrs. Curry was unable to locate the pistol but on her own volition turned over cartridges, wire, detonating cord and a jar of gun powder that were in the apartment. Comstock recognized all items but the "det cord" as government property. Explosive devices had also been found in Sergeant Hicks' quarters. Comstock then asked, "Can the CID come over here and search this place?", and the appellant's wife replied, "Fine." Thereafter, two criminal investigators came to the apartment and obtained Mrs. Curry's signature on a written consent form. The consent form specified that the objects of the search extended to controlled substances, weapons, ammunition and contra-

band. Mrs. Curry indicated to the investigators that she wanted them to look through the apartment as she was concerned for the safety of her children because of the explosive devices that she had discovered. Mrs. Curry took the investigators into a room which she described as "the office" and informed them that this was where the appellant kept his papers and files and "a lot of his stuff." In that room was a filing cabinet and two desks, one of which was used by the appellant, the other by his wife. Neither the desks nor the cabinet were locked. Mrs. Curry specifically said that the agents could look in the filing cabinet. Sergeant William Duffy, one of the agents, searched the cabinet and the desk used by the appellant and found the maps, explosive devices and notes that led him to believe that raids on an arms room and an Army finance center were planned. Based on the evidence seized from his quarters the appellant was convicted of the charges relating to conspiracy to steal government explosives, weapons and currency; larceny of the weapons; and wrongful possession of the explosives and weapons.

## II. *Multiplicity*

The appellant contends that he was deprived of a fair trial by the fragmentation of a single conspiracy into nine specifications. Four of the five trips to Amsterdam were to obtain both cocaine and hashish. Each trip was charged as two specifications, a conspiracy to obtain cocaine and a conspiracy to obtain hashish. The fifth trip was covered in one specification alleging conspiracy to obtain hashish. At trial the defense moved to consolidate all nine conspiracy specifications into a single specification. Two specifications alleging a conspiracy to steal weapons and munitions and a conspiracy to steal money from the Grafenwoehr finance office were not included in the motion. The military judge denied the motion with leave to review it after the evidence on the merits was presented. The defense did not renew the motion.

■ Based on the stipulation of fact, we are convinced that all of the trips to Am-

sterdam were pursuant to a single conspiracy to acquire and distribute hashish and cocaine. Not only did the objectives remain the same but the *modus operandi*—acquiring the drugs in the Netherlands, smuggling them back to a military post in Germany, and transferring and selling them to fellow servicemen—remained unchanged. Although new members joined the conspiracy after its inception, the appellant remained throughout at the core of the conspiracy. Under the circumstances, there was only one conspiracy even though there were two different kinds of drugs involved and even though there were several overt acts over a period of time. The conspiracy must be distinguished from the commission of the substantive offenses which it contemplated. *See Braverman v. United States,* 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942); *United States v. Samuel Dunkel and Co.,* 184 F.2d 894 (2d Cir.1950), *cert. denied,* 340 U.S. 930, 71 S.Ct. 491, 95 L.Ed. 671 (1951).

■ The facts of this case were sufficiently complex to justify the initial fragmented pleading as well as the military judge's deferral of the motion to consolidate until the supporting evidence was before him. *See* Manual for Courts-Martial, United States, 1969 (Revised edition), paragraph 26*b; see generally United States v. Baker,* 14 M.J. 361, 365–66 (C.M.A.1983). However, once the stipulation of fact was before him, the military judge should have consolidated the nine specifications pertaining to acquisition and distribution of hashish and cocaine. Since the specifications do not duplicate or include each other, consolidation rather than dismissal was the appropriate remedy. *See United States v. Huggins,* 12 M.J. 657, 658 (A.C.M.R.1981). However, the trial defense counsel's failure to make the motion to consolidate at the conclusion of the government's case constitutes a waiver of the defective pleading. *Id.* Assuming *arguendo* that the error was not waived, there is no reasonable possibility of prejudice as to findings because all factual issues were effectively resolved by the stipulation of fact. There is no reasonable possibility of prejudice as to sentence because the mili-

tary judge instructed the court members to treat the offenses as a single offense for the purposes of sentencing. Furthermore, even the most remote possibility of prejudice as to sentence was purged by the Secretary of the Army's clemency action. Accordingly, we find the assignment of error without merit.

### III. *Challenge of a Court Member*

During voir dire of Captain Ruth E. Thomas, a court member, the following discussion occurred among her, the detailed defense counsel, and the military judge:

DDC: You are aware of course that the mere fact that the Charges have been preferred does not mean an individual was guilty of anything, is that right?

MEM–CAPTAIN THOMAS: Yes, sir.

DDC: Do you regard the information set forth there on the charge sheets . . . or the arraignment sheets that you have there in front of you as being factually correct essentially?

MEM–CAPTAIN THOMAS: Yes, sir.

DCC: Okay. Thank You. I have no further questions.

MJ: What do you mean by that, factually correct?

MEM–CAPTAIN THOMAS: I meant it would not be written down here if it hadn't happened in some form or another. Factually correct but . . . It's there in facts, but there might be some other facts and circumstances that might make . . . might not make it correct otherwise.

MJ: I've instructed you that the fact that the Charges were preferred or referred is no evidence of the accused's guilt. Do you understand that?

MEM–CAPTAIN THOMAS: Yes, sir.

MJ: So, although you consider that there must be factual . . . there must have been a factual basis or someone would not have preferred or referred those Charges. Do you feel that that's any evidence of the accused's guilt with regard to your determination today and the rest of the week here in court?

MEM–CAPTAIN THOMAS: No. From my own experience, I've seen a lot of them that would go in and just are taken right off. So, it doesn't mean that they are guilty.

MJ: So, are you saying then, that you would make your decision not based upon what somebody has decided with regard to the appropriateness of these Charges but based solely upon what you hear and see in this court?

MEM–CAPTAIN THOMAS: I would say the biggest portion.

MJ: Are you saying that the fact that they have been preferred and referred to trial then that does have a bearing on your decision as to whether or not he's guilty?

MEM–CAPTAIN THOMAS: Not entirely, no, sir.

MJ: But does it have any at all? I've instructed you that it cannot.

MEM–CAPTAIN THOMAS: No, sir. If it .. Okay, if you have them there. He wouldn't be here if he wasn't. I don't know it all whether he is or not.

MJ: I'm absolutely certain that I don't understand how you feel about this up to this point. I've instructed you that the fact that these Charges have been preferred or referred, for that matter, to this court raises [no] inference of his guilt with regard to your determination. Do you understand that?

MEM–CAPTAIN THOMAS: Yes, sir.

MJ: Will that be a factor then in .. Will the fact that they have been preferred and referred be a factor that you will consider in determining whether or not he's guilty or not?

MEM–CAPTAIN THOMAS: No, sir.

MJ: Do you understand what I'm saying?

MEM–CAPTAIN THOMAS: Yes, sir.

MJ: Will the fact that Captain Garrambone preferred the Charges, or the fact that General Thompson referred them to court be any basis at all for your determining whether or not the accused is guilty or innocent?

MEM–CAPTAIN THOMAS: No, sir.

MJ: Okay, in other words, you feel that you can determine that issue based solely upon what you hear in court?

MEM–CAPTAIN THOMAS: Yes, sir.

The trial defense counsel challenged Captain Thomas on the ground that she believed the appellant "would not be [on trial] if he wasn't guilty." The military judge denied the challenge.

 The test to be used in determining whether a judge abused his discretion in denying a challenge is whether the prospective court member "is mentally free to render an impartial finding and sentence based on the law and the evidence." *United States v. Parker,* 6 U.S.C.M.A. 274, 284–85, 19 C.M.R. 400, 410–11 (1955); *accord United States v. McQueen,* 7 M.J. 281 (C.M.A.1979). Applying this test, we are satisfied that the military judge did not abuse his discretion.

Although Captain Thomas first stated that she regarded the information on the charge sheet as "factually correct," the judge advised her that the fact that charges were preferred and referred to trial can have no bearing on a determination of the appellant's guilt. After this explanation, Captain Thomas stated that she could determine the case solely on the evidence introduced in court. Her answers merely reflect her experience, common to most military officers, that charges normally are not preferred and referred to trial unless the accuser is satisfied that an offense has been committed and the convening authority is satisfied that trial by court-martial is warranted by the available evidence. *See* Manual for Courts-Martial, United States, 1969 (Revised edition), paragraphs 32, 33 and 35. Her answers do not indicate a predisposition to convict or an inability or unwillingness to decide the case on the basis of the evidence admitted in court and instructions of the military judge. Accordingly, we find no error in permitting her to sit as a member.

IV. *The Effect of the Confessional Stipulation on the Evidentiary Motions*

 Before considering the issues regarding the admissibility of the evidence, we first must consider whether the confessional stipulation in this case renders the issues regarding the admissibility of the evidence moot. A provident plea of guilty waives appellate consideration of evidentiary motions. Mil.R.Evid. 304(d)(5), 311(i); *United States v. Dusenberry,* 23 U.S.C.M.A. 287, 49 C.M.R. 536 (1975); *United States v. Hamil,* 15 U.S.C.M.A. 110, 35 C.M.R. 82 (1964); *United States v. Higa,* 12 M.J. 1008 (A.C.M.R.1982). The basis for such a rule is that questions of admissibility are moot once guilt is established by a guilty plea, since the conviction is then based on the plea and not on the evidence. *United States v. Dusenberry,* 23 U.S.C.M.A. at 290, 49 C.M.R. at 539; *United States v. Hamil,* 15 U.S.C.M.A. at 111, 35 C.M.R. at 83; *United States v. Higa,* 12 M.J. at 1010. A confessional stipulation is tantamount to a guilty plea. *See United States v. Bertelson,* 3 M.J. 314, 315 n. 2, 316–17 (C.M.A.1977). Logically, it would seem that the legal consequences of a guilty plea and a confessional stipulation should be the same. Once a confessional stipulation has been admitted in lieu of testimonial and real evidence, the conviction is then supported by the stipulation, not the testimonial and real evidence, which the stipulation replaced. However, the case law supports a contrary result. As we noted in *Higa,* there are sound arguments and substantial civilian case authority for permitting a guilty plea conditioned on preservation of appellate issues. 12 M.J. at 1010. Those arguments and precedents were rejected by the drafters of the Military Rules of Evidence. However, there is no rule comparable to Mil.R.Evid. 304(d)(5) and 311(i) regarding confessional stipulations. Furthermore, the Court of Military Appeals and the Courts of Military Review consistently have regarded confessional stipulations as a legitimate means of preserving appellate issues in cases where the facts pertaining to the merits of the case are uncontested. *See, e.g., United States v. Brown,* 12 M.J. 420, 423–24 (C.M.A.1982); *United States v. Mills,* 12 M.J. 1, 2–3 (C.M.A.1981); *United States v. Paige,* 7 M.J. 480 (C.M.A.1979); *United States v. Bertelson,* 3 M.J. at 315–16; *United States v. Hagy,* 12

M.J. 739, 745 (A.F.C.M.R.1981) *pet. denied,* 13 M.J. 204 (C.M.A.1982); *United States v. Bray,* 12 M.J. 553, 557 (A.F.C.M.R.1981); *United States v. Barden,* 9 M.J. 621, 622 (A.C.M.R.1980). Since the Military Rules of Evidence do not preclude consideration of evidentiary issues after a confessional stipulation, as they do after a guilty plea, these cases remain a valid judicial recognition of the proposition that appellate review of evidentiary issues is not foreclosed by a confessional stipulation. Accordingly, we will consider the evidentiary issues presented in this case, notwithstanding the existence of a confessional stipulation.

V. *Search of Sergeant Curry's Quarters*

The appellant contends that the fruits of the search of Sergeant Curry's quarters were inadmissible because the two search authorizations issued by Colonel Rowell were not based on probable cause. Before addressing that issue, we must first decide whether the appellant has standing to contest the legality of the search and seizure. We hold that he does not.

Until recently, the issue of standing could have been decided in summary fashion. The Supreme Court in *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), held that a person charged with a possessory offense had automatic standing to attack an illegal search. The Court also held that "anyone legitimately on the premises" when a search occurs may challenge its legality by a motion to suppress. 362 U.S. at 267, 80 S.Ct. at 734. The appellant would have automatic standing under the *Jones* rationale.

In *Rakas v. Illinois,* 439 U.S. 128, 142, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978), the Court held that the concept of being legitimately on the premises as enunciated in *Jones* is "too broad a gauge for measurement of Fourth Amendment rights." (Footnote omitted.) Instead, the Court reiterated the concept of "legitimate expectation of privacy" enunciated in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Not only must a person have an expectation of privacy, but the expectation must be reasonable. *Rakas v. Illinois,* 439 at 151, 99 S.Ct. at 434 (Powell, J., concurring).

The Court in *Rakas* concluded that the passengers in an automobile did not have an expectation of privacy in the glove compartment or under the seat because they "asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized." *Id.* at 148, 99 S.Ct. at 433. The Court noted that, unlike *Jones,* the petitioners in *Rakas* did not exercise dominion and control over the automobile nor could they exclude others from it. *Id.* at 149, 99 S.Ct. at 433. In *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), the Supreme Court abolished the concept of automatic standing for possessory offenses.

Factors to be considered in determining whether an accused has an expectation of privacy include:

> [W]hether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.

*United States v. Haydel,* 649 F.2d 1152, 1155 (5th Cir.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982).

█ Turning to the facts of this case, we find that the appellant had a possessory interest in the seized property and was legitimately on the premises at the time of his apprehension. However, while he may have had a subjective expectation that the apartment would remain free from governmental intrusion, his expectation was not reasonable in these circumstances. The appellant testified that his expectation was based upon his confidence in Sergeant Curry's judgment of his guests and the "bonding among enlisted men, NCO's." However, the appellant's assertion of a subjective expectation of privacy is belied by his open handling of the hashish and cocaine in

the presence of persons not connected with the conspiracy, including Sergeant Curry's wife and two children, Sergeant Curry's brother, and two enlisted men who lived nearby.

Examining his asserted expectation of privacy from an objective viewpoint, we believe that his mere hope that his co-conspirators would protect him is not an expectation of privacy that society should recognize. To do so would create and protect an expectation of privacy even broader than the automatic standing in *Jones,* which has been rejected. The appellant had no right to exclude others from Sergeant Curry's quarters. He had no right to enter the quarters without the permission of Sergeant Curry or a member of Sergeant Curry's family. He did not reside there, even for short periods. He was on the premises solely for the purpose of distributing the cache of hashish and cocaine. Under the circumstances of this case we conclude that the appellant did not have an objectively reasonable expectation of privacy in Sergeant Curry's quarters or the property seized from those quarters. Accordingly, we hold that the appellant has no standing to object to the governmental intrusion into Sergeant Curry's quarters, and we find the assignment of error without merit.

### VI. *Search of Lieutenant Curry's Quarters*

The appellant contends that the judge erred in denying the motion to suppress evidence seized from his quarters, asserting that his wife lacked authority to consent to the search of her husband's desk and the cabinet and, assuming consent, contending that the examination and seizure of the written material from this filing cabinet was outside the scope of the consent.

█ It is well settled that "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). Consent may be obtained not only from the accused himself but also from third parties who possess "com-

mon authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974) (footnote omitted). *See United States v. Buettner-Janusch,* 646 F.2d 759, 765 (2d Cir.), *cert. denied,* 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981), and cases cited therein. This includes husbands and wives. *See United States v. Ocampo,* 492 F.Supp. 1211, 1236 (E.D.N.Y.1980), *aff'd in part, rev'd in part as to other defendants,* 650 F.2d 421 (2d Cir.1971).

In determining the extent of this authority, we must consider, as in other aspects of search and seizure, the concept of expectation of privacy. As the Fourth Circuit noted:

> [T]hird party consent, no matter how voluntarily and unambiguously given, cannot validate a warrantless search when the circumstances ... manifest to the contrary that the absent target of the search retains an expectation of privacy in the place or object notwithstanding some appearance or claim of authority by the third person. . . .

*United States v. Block,* 590 F.2d 535, 540 (4th Cir.1978) (citations omitted).

The evidence in the instant case establishes that Mrs. Curry voluntarily consented to the search of the desk and cabinet. What we must determine is whether the appellant had an expectation of privacy in these repositories as to his wife. In this regard, the appellant testified that one of the desks was his, the other his wife's. He stated that if he wanted to keep any document from his wife, he would keep it in his desk. He testified further that he also kept some things in the filing cabinet that he did not want his wife to see, such as letters from his sister. His wife, according to the appellant, never had any reason to go into the cabinet. However, he never forbade his wife from going into the desk or cabinet, but considered it to be tacitly understood.

█ We find that the appellant did not exercise exclusive control over the desk and cabinet. We are dealing with a husband

and wife relationship and not merely with that of two co-tenants. The fact that she did not keep her property in these receptacles does not mean that she was precluded from using them, at least in the absence of a specific prohibition to that effect. A *sub silentio* understanding that she would not go into them is not sufficient. *See United States v. Ocampo,* 492 F.Supp. at 1237 n. 17. Any subjective expectation of privacy that the appellant held as against his wife was not objectively reasonable under the circumstances. Accordingly, we hold that Mrs. Curry could lawfully consent to the search of the desk and filing cabinet.

As to the scope of the search, the appellant concedes that the agent could look into the desks and cabinet, assuming lawful consent by Mrs. Curry, but contends that by reading his personal papers, the agent exceeded the degree of inspection necessary to determine if any items listed in the consent form were present.

 "A consent search is reasonable only if kept within the bounds of the actual consent." *United States v. Dichiarinte,* 445 F.2d 126, 129 (7th Cir.1971). In the instant case, the specified objects listed on the written consent form included "controlled substances, weapons, .... ammunition, and contraband." Thus the written form clearly authorized Agent Duffy to look into the desk and cabinet to determine if they contained any of these items. In fact, he found some detonating cords in the cabinet. However, the appellant argues that the search was limited to the items listed on the written consent form. We disagree.

 There is no requirement that consent to a search be reduced to writing. If a written form is used, there is nothing which would legally preclude an authorizing individual from consenting to a broader search than reflected on the written form. Of course, the burden is on the government to establish that consent was given and that the search was conducted within the bounds of the consent. In the case before us we find that Mrs. Curry's consent was broader than was reflected on the form.

When Captain Comstock visited Mrs. Curry on the afternoon of 1 June to inform her of her husband's apprehension, she voluntarily surrendered evidence of her husband's wrongdoing. When Captain Comstock asked, "Can the CID come over here and search this place?", she replied, "Fine." When Sergeant Duffy arrived and joined Captain Comstock at the quarters, Mrs. Curry was cooperative, even helpful. She unlocked the family car and the maid's room and escorted Sergeant Duffy to a storage room in the basement. She pointed out a room she referred to as "the office" and indicated that the office was where the appellant kept most of his papers. Mrs. Curry was present and rendered assistance throughout the search. When Sergeant Duffy found the detailed maps and written plans for a raid on the Grafenwoehr finance center, he asked Mrs. Curry whether he could take them and she agreed. Her overall conduct clearly indicated that she had consented to a generalized search of the apartment. It is clear from the circumstances that Mrs. Curry's execution of the written consent form was not an attempt on her part to limit the scope of the search, but rather was an indication of her willingness to facilitate the search. Her consent to the seizure of the maps and written plans for the raid is an indicia of her intent, originally expressed to Captain Comstock, to consent to a generalized search of the quarters, without limitations. Since we find that Mrs. Curry consented to a generalized search of the apartment, we need not concern ourselves with whether the items seized were explicitly or implicitly included among the items listed in the written consent form or whether the items seized were in plain view. Accordingly, we find the assignment of error without merit.

### VII. *Classification of Cocaine as a Habit-Forming Narcotic*

 The appellant contends that the military judge erred by instructing the court members that cocaine is a habit-forming narcotic as a matter of law. He also contends that the classification of cocaine as a habit-forming narcotic deprives him of equal protection of the law. The issues

raised by these assignments of error were decided adversely to the appellant in *United States v. Ettleson,* 13 M.J. 348 (C.M.A.1982). Accordingly, we conclude that these assignments of error are without merit.

### VIII. *The Request for Special Findings*

After the military judge denied the appellant's motions to suppress the evidence, the trial defense counsel asked, "Does the military judge intend to announce a rationale for that?" The military judge replied, "I don't, unless you make a request for specific findings and address those areas you wish to have specific findings announced on." The trial defense counsel then requested "specific findings," and the military judge stated that he would grant the request "[U]pon written request and specific announcement of the areas you wish to have findings on." The military judge further stated that he would assume that the request for special findings was withdrawn if a written request were not submitted. No written request was submitted, and no special findings were entered.

██ The appellant now contends that the military judge erred by requiring the request for special findings to be submitted in writing. We find the assignment of error without merit. Article 51(d), Uniform Code of Military Justice, 10 U.S.C. § 851(d) (1976), and paragraph 74*i* of the Manual authorize special findings only in trials by military judge sitting without members. The appellant's case was tried with members. Furthermore, prior to the effective date of the Military Rules of Evidence, the appellant was not entitled to special findings on a motion to suppress, since Article 51(d) and paragraph 74*i* pertained only to findings of fact related to the general finding of guilt or innocence. *United States v. Kressin,* 2 M.J. 283, 286 (A.F.C.M.R.1976), *rev'd on other grounds,* 5 M.J. 393 (C.M.A. 1978). Although Mil.R.Evid. 311(d)(4) requires a military judge to "state essential findings of fact on the record" when factual issues are involved in a motion to suppress, that provision is not applicable to this case, because the trial of this case was concluded on 21 August 1980, prior to the effective date of the Military Rules of Evidence. *See* Executive Order Number 12198, 12 March 1980, establishing 1 September 1980 as the effective date of the Military Rules of Evidence.

### IX. *Post-Trial Delay*

The appellant contends that he suffered substantial prejudice by a delay of nearly eight months between the conclusion of his trial and the action of the convening authority on the findings and sentence. He asks that the Court reassess the sentence to remedy the effects of the dilatory processing of his case. We find that the case was processed with diligence, that the appellant has suffered no prejudice, and that no relief is warranted.

The appellant was sentenced and confined on 21 August 1980. On 6 October 1980 responsibility for post-trial action in the case was transferred to the Commanding General, VII Corps, a substitute convening authority, because the original convening authority had disqualified himself by granting immunity to appellant's co-conspirators. The appellant was not transferred to the United States Disciplinary Barracks, but was retained in the command over defense objection and was granted testimonial immunity in order to be available as a witness against his co-conspirators, the last of whom was tried on 12 January 1981. On 21 October 1980 the military judge authenticated the record of trial, consisting of 747 pages. On 29 October 1980 the trial defense counsel informed the military judge that the assistant trial counsel may have been disqualified because of his involvement in the apprehension of the appellant. The military judge orally notified a member of the VII Corps staff judge advocate's office of the potential disqualification on 6 November 1980 and confirmed that notification by letter dated 21 November 1980, which was received by the staff judge advocate, VII Corps, on 2 December 1980. In order to determine the extent of the prosecutorial involvement in the appellant's ap-

prehension, revision proceedings were ordered on 2 February 1981 and conducted on 9 February 1981. The record of the revision proceedings was authenticated on 20 February 1981. The appellant was transferred to the United States Disciplinary Barracks on 27 February 1981. He was considered by the Army Clemency Board shortly after his arrival and, based upon the Board's recommendation, the Secretary of the Army reduced the appellant's term of confinement from thirty to seventeen years.

The appellant repeatedly voiced his objection to being confined in Europe instead of the United States Disciplinary Barracks. On 4 December 1980 he petitioned the convening authority for relief. His request was denied on 10 December 1980. On 7 January 1981, he petitioned the Court of Military Appeals for extraordinary relief. On 19 February 1981 the Court of Military Appeals ordered the various respondents to show cause why the requested relief should not be granted. *Curry v. Commanding General,* 10 M.J. 337 (C.M.A.1981). After the respondents answered, the Court of Military Appeals ordered the convening authority to complete his review and action and file a copy of his action with the Court on or before 6 May 1981. *Curry v. Commanding General,* 11 M.J. 158 (C.M.A.1981).

The staff judge advocate completed his lengthy post-trial review, consisting of sixty-four pages and numerous appendices, on 5 March 1981. The trial defense counsel requested and received additional time to file a rebuttal pursuant to *United States v. Goode,* 1 M.J. 3 (C.M.A.1975). The trial defense counsel's lengthy rebuttal and a brief submitted pursuant to Article 38(c), Uniform Code of Military Justice, 10 U.S.C. § 838(c) (1976), were received by the staff judge advocate on 3 April 1981. On 15 April 1981 the staff judge advocate completed a four-page addendum to his post-trial review, addressing the issues raised in the trial defense counsel's response and brief. The convening authority took his action on 16 April 1981.

We hold that both prongs of appellant's assignment of error are without merit: we find no inordinate delay, and we find no prejudice. *See United States v. Banks,* 7 M.J. 92 (C.M.A.1979).

■ We hold that the retention of the appellant in the command to facilitate his testimony against his co-conspirators was reasonable and justifiable. The unusual length and complexity of the record of trial, the need for proceedings in revision and the complexity of the post-trial review and defense brief, considered together, justify the time spent to review this case and present it to the convening authority.

■ Turning to the question of specific prejudice, we find none. Post-trial confinement is not itself conclusive of prejudice. *See United States v. Prater,* 20 U.S. C.M.A. 339, 342–43, 43 C.M.R. 179, 182–83 (1971). However, the appellant claims that he was deprived of timely consideration for clemency. He correctly points out that he was entitled to clemency consideration after serving not less than six months nor more than eight months of his sentence. *See* Army Regulation 190–47, *Military Police—United States Army Correctional System* (1 November 1980), paragraph 6–14*f*(3). However, the record shows that the appellant was sent to the United States Disciplinary Barracks six months and six days after he was sentenced, well within the time frame for initial clemency consideration. Given the facts and circumstances of this case, we perceive that there was no reasonable likelihood that the Army Clemency Board would have recommended the appellant's immediate release from confinement. To the contrary, Army clemency authorities, although granting substantial clemency, nevertheless felt that substantial confinement, i.e., seventeen years, was warranted. Accordingly, we find no prejudice. *See United States v. Gray,* 22 U.S.C.M.A. 443, 445, 47 C.M.R. 484, 486 (1973). We find the assignment of error without merit.

### X. *Failure of the Convening Authority to Read the Post-Trial Review*

The appellant contends that he was denied military due process by the failure of

the convening authority to read the staff judge advocate's post-trial review, the defense rebuttal, and the supplemental review addressing the matters raised in the defense rebuttal. He bases his contention on an affidavit from the staff judge advocate, in which the staff judge advocate recites that "Lieutenant General Becton did not personally read either the record of trial or the entirety of the post-trial review, the rebuttal thereto, or the supplemental post-trial review." The staff judge advocate also recites that he "presented a detailed [oral] briefing to Lieutenant General Becton on the issues raised during the course of the trial, the post trial issues, the status of the evidence, and my recommended disposition." The staff judge advocate's briefing lasted twenty to twenty-five minutes and concluded with the staff judge advocate's recommendation that Lieutenant General Becton "reassess the sentence and approve the findings and sentence adjudged by the court as being appropriate."

In determining whether the appellant was denied military due process, we must first ascertain what Congress intended to accomplish by enacting Article 61 of the Uniform Code of Military Justice, 10 U.S.C. § 861 (1976). The requirement for a post-trial review by the staff judge advocate was first enacted in Article of War 46, Act of June 4, 1920, 41 Stat. 787, which provided that: "Under such regulations as may be prescribed by the President every record of trial by general court-martial or military commission received by a reviewing or confirming authority shall be referred by him, before he acts thereon, to his staff judge advocate or to the Judge Advocate General." The Presidential regulations contemplated by Congress were promulgated in paragraph 370, Manual for Courts-Martial, United States Army, 1921 (hereafter referred to as the 1921 Manual), which required a "written review, or report, as circumstances may require...." In a case where the evidence supporting the conviction was clear and conclusive, all that was required was a "report" to that effect. An analysis of the evidence, followed by an opinion and a statement of reasons for the opinion was required only if "the evidence in support of a specification is weak or conflicting, or where the evidence for the defense tends to weaken the evidence for the prosecution or to disprove the allegations in the specification...." With respect to legal errors or irregularities, no analysis or discussion was required unless there were "errors or irregularities which may be regarded as affecting the substantial rights of the accused or as invalidating the sentence in whole or in part...." In short, a written legal "review" was required only in those cases where there were questions of law or fact of sufficient significance to require the exercise of discretion by the convening authority.

The drafters of the 1921 Manual were cognizant of the traditional Army staff procedure whereby staff officers presented a commander with oral "decision briefings" on matters requiring the commander's personal attention. Staff judge advocates customarily utilized oral decision briefings on matters of military justice, and that practice has continued up to the present. The drafters' intention to preserve rather than eliminate the oral briefings on military justice matters was reflected by their observation that "the review or report is intended to supplement, not replace, the personal interview which the reviewing authority has with the staff judge advocate or the assistant who studies the case." 1921 Manual, paragraph 370 n. 1.

When the Manual for Courts-Martial was revised in 1928, the discussion of the form and content of the review was abbreviated, providing only that:

> The staff judge advocate will submit a written review of the case. The review will include his opinion, both as to the weight of evidence and any error or irregularity, and a specific recommendation of the action to be taken together with his reasons for such opinion and recommendation.

Manual for Courts-Martial, United States Army, 1928, paragraph 87*b* (hereafter referred to as the 1928 Manual). The same paragraph authorized an oral supplementa-

ry review when requested by the convening authority.

In 1948 the Articles of War were amended, and the requirement for a post-trial review was incorporated in Article of War 47(c), Act of June 24, 1948, 62 Stat. 627, providing in pertinent part that "the reviewing authority will refer [the record of trial] to his staff judge advocate or The Judge Advocate General for review and advice; and no sentence shall be approved unless upon conviction established beyond reasonable doubt of an offense made punishable by these Articles, and unless the record of trial has been found legally sufficient to support it." The Manual for Courts-Martial, United States Army, 1949 (hereafter referred to as the 1949 Manual) retained the provision of the 1928 Manual authorizing an oral supplementary review.

The 1949 Manual also introduced the requirement that a reviewing authority who disagreed with his staff judge advocate transmit the record of trial to The Judge Advocate General with an explanation of his reasons for rejecting the opinion of his staff judge advocate. The drafters considered the old Article 46 and paragraph 87 b of the 1928 Manual unsatisfactory because those provisions did not preclude a reviewing authority from ignoring his staff judge advocate and approving a sentence despite the staff judge advocate's opinion that the proceedings were legally defective. By requiring the record of trial to reflect both the staff judge advocate's review and the reviewing authority's justification for rejecting the staff judge advocate's opinion, the drafters hoped to lend greater influence to the findings and recommendations of the staff judge advocate. *See Seminars Presented During the Orientation Conference on the Manual for Courts-Martial, 1949, Held in the Office of the Judge Advocate General, Washington, D.C.* 132 (1948) (found in the Army Library, The Pentagon, Washington, D.C.).

The requirement for a post-trial review was retained when the Uniform Code of Military Justice was adopted in 1950. Article 61 of the Code provided in pertinent part that "[t]he convening authority shall refer the record of each general court-martial to his staff judge advocate or legal officer, who shall submit his written opinion thereon to the convening authority." The Manual for Courts-Martial, United States, 1951 (hereafter referred to as the 1951 Manual), retained the language of the 1949 Manual regarding the form and content of the review, but added a requirement that the review include a summary of the evidence. *See* 1951 Manual, paragraph 85*b*. Both Article 61 of the Code and paragraph 85*b* of the Manual for Courts-Martial remained unchanged when the Code was revised in 1968.

The intent of Congress in 1950 was to adopt the practice established by the Army over a number of years. *See* Hearings Before House Armed Services Committee on H.R. 2498, Uniform Code of Military Justice, 81st Congress, 1st Session at 1177; House Report Number 491, 81st Congress, 1st Session at 29; Senate Report Number 486, 81st Congress, 1st Session at 26. That practice included the custom of orally briefing the convening authority, preparing a written review, and presenting oral supplementary reviews when requested by the convening authority. There is nothing in the legislative history of the Uniform Code of Military Justice suggesting that the convening authority and his staff judge advocate were restricted to written communications and prohibited from discussing a case orally. To the contrary, the legislative history of Article 61 indicates that Congress intended to perpetuate the Army practice of preparing a written review and presenting an oral briefing as part of the post-trial process. A contrary interpretation would be inconsistent with the Congressional intent, expressed in Article 6(b), Uniform Code of Military Justice, 10 U.S.C. § 806(b) (1976), that convening authorities and staff judge advocates enjoy direct and unrestricted communication on matters pertaining to the administration of military justice.

In this case the staff judge advocate's affidavit establishes that the convening authority was advised orally of the "sta-

tus of the evidence" and the legal issues in the case and received his staff judge advocate's opinion and recommendation. In the absence of evidence to the contrary, we will presume that the staff judge advocate insured that those matters required by Article 61 of the Code and paragraph 85b of the Manual were brought to the attention of the convening authority during the oral briefing. See United States v. Pugh, 99 U.S. 265, 25 L.Ed. 322 (1878) (presumption of regularity in governmental affairs); United States v. Moschella, 20 U.S.C.M.A. 543, 43 C.M.R. 383 (1971) (presumption of regularity in referral of charges to court-martial); United States v. Masusock, 1 U.S. C.M.A. 32, 35, 1 C.M.R. 32, 35 (1951) (Army officials presumed to perform duties in accordance with regulations); United States v. Livingston, 7 M.J. 638, 640 (A.C.M.R. 1979), aff'd, 8 M.J. 278 (C.M.A.1980) (presumption of regularity in convening court and referring case to court-martial); United States v. Saunders, 6 M.J. 731, 734 (A.C. M.R.1978) (en banc) (presumption of regularity in selecting and detailing court members and military judge).

■ Basic rules of statutory construction require us to interpret Article 61 and the Manual in a way which does not require a useless or futile act. United States v. American Trucking Associations, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940); see 2 A. Sands, Sutherland Statutory Construction § 45.12 (4th ed. 1973). To require the convening authority to read what he has just been told would require a useless act. We believe that where the staff judge advocate has prepared a written post-trial review and has orally briefed the convening authority on the matters required by paragraph 85b of the Manual, the intent and spirit of the law have been met even if the convening authority does not read the written version of what he has been told. In such a case the staff judge advocate must insure that the written review accurately reflects the matters covered in the oral briefing, so that appellate authorities can examine the post-trial review for accuracy and completeness. See United States v. Johnson, 8 M.J. 634, 637

(A.C.M.R.1975) (written review shows appellate authorities what advice was given); cf. United States v. Davis, 18 U.S.C.M.A. 170, 172, 39 C.M.R. 170, 172 (1969) ("When a supplemental oral report is requested or given it may not deviate from the contents of the written report and must thereafter be made a part of the written record."). Such a procedure constitutes substantial compliance with Article 61 of the Code and paragraph 85b of the Manual. To the extent that it does not comply with the literal language of the Code or the Manual, such noncompliance is, at most, a harmless procedural irregularity. Accordingly, we hold that in this case there was substantial compliance with Article 61 of the Code and paragraph 85b of the Manual.

■ Even assuming arguendo that there was less than substantial compliance with Article 61 and paragraph 85b in this case, there is no possibility of prejudice. Defects in a post-trial review are tested for specific prejudice. See United States v. Hill, 22 U.S.C.M.A. 419, 47 C.M.R. 397 (1973); United States v. Arnold, 21 U.S.C.M.A. 151, 44 C.M.R. 205 (1972). We are satisfied that any deficiency in the post-trial review in this case would amount to a harmless procedural error. Since the facts of this case were uncontested, any defects in the summarization or analysis of the evidence would be harmless, because the convening authority was not required in this case to weigh conflicting evidence. See United States v. Hooper, 11 U.S.C.M.A. 128, 130, 28 C.M.R. 352, 354 (1960) (failure to "rationalize and discuss" conclusions not error where the choices available to the convening authority were "virtually spelled out by a statement of the evidence...."); United States v. Westrich, 9 U.S.C.M.A. 82, 25 C.M.R. 344 (1958) (defective review not prejudicial as to findings to which the accused pleaded guilty).

■ Since there were no substantial legal errors committed during the trial of this case, the appellant was not deprived of any substantial right respecting resolution of those legal issues by the convening authori-

ty. Any incomplete discussion of a legal question amounted to a harmless procedural error. In the first place, the convening authority, a non-lawyer, was not likely to disagree with his staff judge advocate. *See United States v. Cansdale,* 7 M.J. 143, 147 (C.M.A.1979). Secondly, even if he was of a mind to disagree with his staff judge advocate, the appellant was not entitled to incorrect legal decisions from the convening authority. *See United States v. Huddleston,* 50 C.M.R. 99, 109 (A.C.M.R.1975); *United States v. Lea,* 39 C.M.R. 459 (A.B.R. 1968).

With respect to the sentence, any deficiencies in the review regarding sentence appropriateness were cured by the substantial grant of clemency from the Secretary of the Army. Accordingly, we conclude that the assignment of error is without merit.

### XI. *Other Assignments of Error Asserted by the Appellant*

In addition to the assignments of error briefed by appellate counsel, the appellant asserted several errors on his request for appellate counsel. Since this case was briefed before the decision of the Court of Military Appeals in *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), counsel did not mention such assignments of error in their brief. Nevertheless, we have considered each of the assignments of error listed by the appellant on his request for appellate counsel and have found them without merit. Only one merits discussion.

■ The military judge instructed the court members that the maximum period of confinement was eighty years. The staff judge advocate advised the convening authority that the maximum was seventy years. He recommended that the convening authority assume the maximum to be sixty years, in order to avoid even a remote possibility of prejudice to the appellant. The convening authority reassessed the sentence but approved it as adjudged. Even assuming that the convening authority's action was incorrect, any possibility of prejudice was cured by the Secretary of the Army's clemency action, reducing the period of confinement from thirty to seventeen years.

### XII. *Sentence Appropriateness*

■ The appellant contends that his sentence is excessively severe, especially in relation to the sentences received by his co-conspirators. We find the sentence as modified by the Secretary of the Army appropriate. The appellant abused the special trust and confidence reposed in him as a commissioned officer by actively participating in a large scale drug smuggling operation. He recruited enlisted personnel to join the conspiracy. He planned the break-in of an unit arms room and the Grafenwoehr finance center to finance the drug operation. He abused his position as the executive officer of an engineer company to steal ammunition, pyrotechnics, weapons and explosive training devices. He actively encouraged soldiers subject to his command to engage in large scale criminal activity. Although he joined an ongoing conspiracy he quickly became the ring leader. We consider the punishment in this case appropriate and any further clemency action unwarranted.

The findings of guilty and the sentence as modified by the Secretary of the Army are affirmed.

Chief Judge HANSEN concurs.

O'DONNELL, Senior Judge, concurring in part and dissenting in part:

I agree with the majority with respect to Parts I, II, III, IV, VII, VIII, IX, XI and XII. I disagree, however, with Parts V and VI (the two searches) and concur in the result only as to Part X (post-trial review).

### I. *The Two Searches*

Initially, I disagree that the appellant lacked standing to contest the legality of the search of Sergeant Curry's quarters. The Supreme Court in recent cases has limited the right of a person to attack the search of another's residence. *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d

387 (1978). Since those decisions, persons charged with possessory offenses and persons legitimately on the premises of another do not have automatic standing to contest the legality of a search. The test now is whether the person has a "legitimate expectation of privacy" in the place to be searched. *Rakas v. Illinois,* 439 U.S. at 143, 99 S.Ct. at 430. *See United States v. Underwood,* 693 F.2d 1306 (9th Cir.1982). The concept of being legitimately on the premises, albeit no longer controlling, is nonetheless relevant on the question of expectation of privacy, together with such other facts as whether

> the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, [and] whether he took normal precautions to maintain his privacy....

*United States v. Haydel,* 649 F.2d 1152, 1155 (5th Cir.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982).

I would hold that Lieutenant Curry had a legitimate expectation of privacy in Sergeant Curry's apartment (or at least in that portion where the drugs were located) and could contest the legality of the search. Although he did not have a possessory interest in the apartment, he did have such an interest in the property seized and he was legitimately on the premises. It is true, as the majority points out, that other persons knew of the drug ring's activities and that five persons not connected with the conspiracy, including Sergeant Curry's brother and two children, were present in the apartment. This does not mean, however, that the appellant lacked an expectation that the apartment would remain free from governmental intrusion. Lieutenant Curry testified that he had confidence in Sergeant Curry's judgment of his guests. Moreover, he relied on the "bonding among enlisted men, NCO's." This demonstrates that the appellant possessed a subjective expectation of privacy.[1] The fact that Lieutenant Curry had no right to exclude others from the apartment, while probative on the question of his expectation of privacy, is not dispositive of that question. I am satisfied that Lieutenant Curry had a reasonable and a legitimate expectation of privacy.

In view of my conclusion that the appellant had an expectation of privacy that is recognized by the courts, I turn now to the legality of the search. The appellant's first contention is that the search was not based on probable cause. In this regard, he argues essentially that the information made available to the authorizing commander failed to establish the reliability of the informant, Specialist Monaghan. I am satisfied that there was probable cause and that the informant was reliable within the meaning of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), at least when Colonel Rowell authorized the search on the morning of 1 June.[2] Monaghan received his information from one of Lieutenant Curry's co-conspirators. This meets the first, or basis of knowledge, prong of *Aguilar. See Spinelli v. United States,* 393 U.S. 410, 423–29, 89 S.Ct. 584, 592–595, 21 L.Ed.2d 637 (1959) (White, J., concurring). Further, Monaghan's credibility was established by testimony that he had given relia-

---

1. This case differs from the recent case of *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), where the defendant admitted that he had no expectation that the subject of the search, a purse, would remain "free from governmental intrusion." *Id.* at 105, 100 S.Ct. at 2561.

2. The Supreme Court in *Aguilar* held that an affidavit in support of a search warrant may be based on hearsay information received from an informant and need not reflect the personal observation of the person seeking the warrant. In such a case, however,

> the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer [requesting the search warrant] concluded that the informant, whose identity need not be disclosed, was "credible" or his information "reliable."

378 U.S. at 114, 84 S.Ct. at 1514 (citations and footnote omitted).

ble information in the past concerning Sergeant Curry's activities and by the fact that his statements to the authorities represented in part a declaration against interest. *See United States v. Harris*, 403 U.S. 573, 583, 91 S.Ct. 2075, 2081–2082, 29 L.Ed.2d 723 (1971). Moreover, the information may be considered reliable through corroboration of certain facts. Hicks' involvement was verified when one of the investigators observed cotton sacks soaked with hashish oil in Hicks' quarters. Monaghan's statement that the appellant planned to go to Amsterdam at the end of May to obtain more hashish was also verified by information that the appellant had procured a pass for the Netherlands for the period 28 May to 1 June and by the arrival of the appellant, Sergeant Jones, and Davis at Sergeant Curry's quarters on the morning of 1 June.[3]

The difficulty in this case is not probable cause but the validity of the authorization to search and seize. Colonel Rowell authorized the first search in accordance with a command policy letter which provided pertinently:

> When physically present for duty within the community the Community Commander will authorize all requests for searches. During these periods when the Community Commander is not physically present for duty within the community, the Deputy Community Commander or the executive officer (in that priority) will authorize all requests for searches.

The Court of Military Appeals in *United States v. Kalscheuer*, 11 M.J. 373 (1981), held that a commander may not delegate his authority to order searches to his subordinate.[4] However, the policy letter is not so much a delegation of authority as it is a recognition of the principle that responsibility to act devolves on the immediate subordinate in the absence of the commander. This principle was recognized in *Kalscheuer*. Accordingly, when Colonel Rowell authorized the first search, he was, in view of the absence of Colonel van Loben Sels, the act-

ing commander with full authority to authorize searches. The difficulty arises when Colonel Rowell orally authorized the second search on the following morning. At that time, Colonel van Loben Sels had returned to the community and Colonel Rowell was no longer the acting commander. The second authorization, therefore, was a nullity. Unless the resulting search and seizure may be sustained on some other basis, they were illegal.

At trial, the Government contended that the search was justified by the exigencies of the moment. It is settled that law enforcement officials may conduct warrantless searches based on probable cause and the existence of exigent circumstances. *See United States v. Barden*, 9 M.J. 621 (A.C.M.R.1980), and cases cited therein. The problem with the argument in this case is that it finds no support in the evidence.

Sergeant Hamilton testified that he sought authorization from Colonel Rowell on Sunday morning rather than from Colonel van Loben Sels because he feared that Sergeant Jones, one of the conspirators, would leave the apartment with some of the contraband and that his apprehension outside the building might alert those inside and permit them to destroy the remaining evidence. This fear, however, could have been obviated by apprehending Sergeant Jones away from the apartment building. Sergeant Hamilton also testified that he did not obtain authority from Colonel van Loben Sels at that time because Colonel Rowell already had the facts and it would take less time to go back to him since otherwise he would have to prepare another authorization with supporting documents, brief Colonel van Loben Sels and then conduct the search.

It is true that a delay of some time would occur, but that did not create an exigency. The apartment building was under surveillance. If the parties attempted to leave, an exigency would then have been created jus-

---

**3.** Monaghan had stated that the drugs would be brought either to Hicks' or Sergeant Curry's quarters on that morning.

**4.** That aspect of the decision was held to be prospective only in application. *Kalscheuer* was decided after the trial in the instant case.

tifying the warrantless search and apprehension, but not before. *United States v. Barden, supra.*

Notwithstanding, may the search be upheld as one incident to a lawful apprehension? As noted above, Colonel Rowell's authorization not only directed a search of the premises but provided that Lieutenant Curry and others be apprehended. The authorization to apprehend, like that to search, was invalid, at least to the extent that it related to Sergeant Curry, because Colonel Rowell was no longer in command when he issued it. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *United States v. Jamison,* 2 M.J. 906 (A.C. M.R.1976). The question therefore is whether a valid apprehension warrant was required to apprehend Lieutenant Curry in Sergeant Curry's apartment.

This is an area that is not completely settled. The Supreme Court held in *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), that a warrantless arrest may be made in a public place if supported by probable cause. An arrest warrant, however, is required to arrest a person in his own home in the absence of exigent circumstances or consent. *Payton v. New York, supra; United States v. Jamison, supra.* The instant case falls between these two extremes—an apprehension in the home of a third party. The Court in *Payton* specifically reserved judgment on this point. 445 U.S. at 583, 100 S.Ct. at 1378.

I would hold that so long as a person has a legitimate expectation of privacy in the premises where the arrest is to take place, an arrest warrant is required and he has standing to attack the lack of a valid warrant. This conclusion is implicit in *United States v. Clifford,* 664 F.2d 1090, 1092 (8th Cir.1981). In that case, the police arrested Clifford in the home of a third party with a valid arrest warrant but no search warrant. During a search incident to the arrest, a pistol was found on his person. Relying on *Steagald v. United States,* 451 U.S. 204, 101

S.Ct. 1642, 68 L.Ed.2d 38 (1981), Clifford contended that the search was illegal.[5] The court distinguished *Steagald* as that case involved the rights of the homeowner. The court concluded that unless Clifford had a legitimate expectation of privacy in the home, *Steagald* provided no basis for relief. Moreover, the court added that even if Clifford had an expectation of privacy, he would have no greater rights than the homeowner. Under *Payton,* the homeowner, of course, may be arrested in his own home only with an arrest warrant, in the absence of exigent circumstances or consent. As the police had an arrest warrant for Clifford, he could not complain about the search, even assuming an expectation of privacy. The implication is clear that if there were no arrest warrant and Clifford had an expectation of privacy, he could assert the lack of the arrest warrant and attack the search. He would then be in the same position as the homeowner and *Payton* would control.

The same rationale applies to Lieutenant Curry. As already noted, he had an expectation of privacy in Sergeant Curry's apartment. As such, he may properly assert the invalidity of the arrest warrant and contest the search incident thereto. *See United States v. Underwood, supra,* where the court held that both a search warrant and an arrest warrant are required to conduct a nonconsensual, nonexigent entry into a private home to arrest a third party in the home. *Cf. State v. Ferguson,* 119 Ariz. 55, 579 P.2d 559 (1978) (warrantless arrest of suspect in home of third party upheld because of exigent circumstances). *But see Patterson v. Commonwealth,* 630 S.W.2d 73 (Ky.Ct.App.1982).

In view of the foregoing, I would hold that the search of Sergeant Curry's quarters was illegal, that the appellant had standing to assert this illegality, and that the motion to suppress the evidence seized during this search should have been granted.

---

5. *Steagald* holds that an owner's right to privacy in his home may not be infringed without a search warrant when police seek to arrest another within the premises.

As to the search of Lieutenant Curry's quarters, I agree that a wife may consent to a search of premises occupied by her and her husband. I also agree that Mrs. Curry properly authorized the criminal investigators to search the cabinet and her husband's desk, as I find, like the majority, that Lieutenant Curry did not exercise exclusive control over these repositories. Unlike the majority, however, I would hold that the search of the desk and the cabinet exceeded the scope of the consent to the extent that it included an examination of Lieutenant Curry's papers.

My reading of the record convinces me that the scope of the consent was accurately reflected on the form signed by Mrs. Curry, i.e., a search for controlled substances, weapons, ammunition and contraband. A consent search represents an exception to the requirement for a warrant supported by probable cause and as such should be narrowly construed. I do not find anything in the testimony supporting a conclusion that Mrs. Curry consented to a generalized search of the apartment. More specifically, I do not agree that she consented to a search of her husband's private papers, even assuming that she could legitimately consent to such a search. Her acquiesence in the removal of the maps and notes occurred after the search and seizure were consummated and cannot operate as a retroactive consent.

The government contends that the perusal of Lieutenant Curry's notes fell within the scope of the consent because of the recognized fact that drug dealers keep extensive records of their transactions. The difficulty with this argument is that, even accepting the record-keeping propensity of drug dealers, the object of the search as reflected in the consent form did not include records. It is doubtful that Duffy even intended to look for such records. Otherwise he would have included them in the consent form which he prepared. In his testimony, Duffy stated that he was looking for "explosives, drugs, and contraband" in the desk and cabinet. This is consistent with the terms of the consent. It was only after some prodding by the military judge

that Duffy stated that he was also looking for documentary evidence of drug dealing. Even if I were to credit Duffy with having this objective at the time of the search, a doubtful conclusion under the circumstances, it still does not bring these records within the scope of the consent granted. *See United States v. Dichiarinte,* 445 F.2d 126, 129–30 (7th Cir.1971).

In my view, Agent Duffy could properly look into the desk and cabinet to determine if they contained "controlled substances, weapons, ... ammunition and contraband" as specified in the consent form. In fact, he found some detonating cords in the cabinet. But the consent granted did not permit him to look through Lieutenant Curry's personal papers and his examination of the documents was illegal unless it could be justified under the aegis of the plain-view doctrine.

Evidence in plain view may be seized if the government agent is lawfully on the premises, if the discovery of the evidence is inadvertent, and if the evidentiary nature of the evidence is "immediately apparent." *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).

To sustain the seizure of the documents in this case as a plain-view seizure, the government relies heavily on that line of cases epitomized in *United States v. Ochs,* 595 F.2d 1247 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). In that case, the court held that "when in the course of a legal warrantless search a police officer comes upon a suspicious object, he is entitled to inspect it and, if it consists of fruits, instrumentalities or evidence of crime, to seize it, even though the crime was not that which justified the search." *Id.* at 1256.

*Ochs* and its ilk represent a modification of the "immediately apparent" aspect of the plain-view doctrine. Under this modification, the incriminating nature of the object need not be "immediately apparent" without close inspection so long as there is reasonable cause to believe that the discovered

item is evidence of a crime. Under those circumstances, a police officer may inspect such an item in plain view to determine whether it is in fact incriminatory. In those cases permitting this close inspection, the suspicious nature of the object was apparent from its appearance or from its proximity to other incriminatory items. *See, e.g., United States v. Chesher,* 678 F.2d 1353 (9th Cir.1982); *United States v. Hillyard,* 677 F.2d 1336 (9th Cir.1982); *United States v. Mannino,* 635 F.2d 110 (2d Cir. 1977); *United States v. Damitz,* 495 F.2d 50 (9th Cir.1974). But lacking this reasonable cause to believe that the object is evidence of a crime, further examination is not permitted. *See United States v. Wright,* 667 F.2d 793 (9th Cir.1982). *Cf. United States v. Phillips,* 593 F.2d 553 (4th Cir.1978), *cert. denied,* 441 U.S. 947, 99 S.Ct. 2169, 60 L.Ed.2d 1050 (1979).

In the case *sub judice,* the item that triggered Duffy's suspicion was an index card in the cabinet containing the phrase "Freedom of Movement." Upon observing this language, Duffy scrutinized the document further and then proceeded with a thorough examination of all of Lieutenant Curry's papers and maps in the cabinet.

I would hold that these circumstances did not justify a plain-view seizure. In the first place, the "suspicious" index card was not in plain view until Duffy rifled through the papers. While Duffy could look in the cabinet for drugs, explosives, and contraband, he could not, as already noted, peruse Lieutenant Curry's personal papers. Moreover, the phrase "Freedom of Movement" was innocuous and a glimpse of it was insufficient to provide a reasonable belief that it was evidence of a crime. Further examination of the documents therefore was precluded. Accordingly, the search was illegal, Lieutenant Curry's personal papers were unlawfully seized and the motion to suppress should have been granted.

## II. *Post-Trial Review*

The convening authority shall refer the record of trial of each general court-mar-

tial to his staff judge advocate or legal officer, who shall submit his written opinion thereon to the convening authority. Article 61, Uniform Code of Military Justice, 10 U.S.C. § 861. To me, this language by clear implication requires the convening authority to read the opinion or review after it has been written and submitted to him. I cannot conceive what Congress expected the convening authority to do with a written review that has been submitted to him if he is not required to read it. Nothing in the legislative history as related in the majority opinion convinces me to the contrary.

In enacting Article 61 of the Code, Congress adopted the language appearing in the 1928 and 1949 Army Manuals for Courts-Martial, which to me also by clear implication required the convening authority to read the written review. I realize that the earlier Manuals contemplated that the staff judge advocate could supplement the written review with an oral presentation. However, this merely recognized an accepted method of doing business and is not authority for concluding that an oral briefing may supplant the written review.

The majority states that to require a convening authority to read what he has just been told would require a useless act. This begs the question of whether the convening authority is required by statute to read the review. If he is so required, as I believe, then he must read it regardless of what he may have been told orally.

I agree, however, that the error should be tested for prejudice. In his affidavit, the staff judge advocate stated that he orally briefed the convening authority "on the issues raised during the course of the trial, the post-trial issues, the status of the evidence and [his] recommended disposition." Under the circumstances, I do not find prejudice. The only issues of substance in the case, especially in view of the confessional stipulation, concern the legality of the two searches. The staff judge advocate presumably addressed these issues.[6]

---

**6.** He came to the wrong conclusion in my opinion, but the remedy for that is not a new

post-trial review but rather a setting aside of

the findings and sentence because of the illegal